THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EZEKIEL McDANIEL, Defendant-Appellant.

First District (3rd Division)    No. 1—98—4719

Opinion filed December 5, 2001.

Rita A. Fry, Public Defender, of Chicago (Timothy J. Leeming, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HALL delivered the opinion of the court:

Ezekiel McDaniel, also known as Lucius (defendant), a 14-year-old minor tried as an adult, was indicted for first-degree murder and aggravated battery with a firearm. On July 14, 1998, a hearing was held before the Honorable John Moran, on defendant's motion to suppress his confession statement. Defendant's motion was subsequently denied. On September 18, 1998, following a jury trial before the Honorable Kenneth Wadas, defendant was found guilty of first-degree murder and aggravated battery with a firearm. On October 28, 1998, defendant was sentenced to 50 years' imprisonment for first-degree murder and 20 years' imprisonment for aggravated battery with a firearm, to be served consecutively.

On appeal, defendant contends that: (1) his confession statement was involuntary under the totality of the circumstances test; (2) he was denied a fair trial when the State introduced into evidence and read out loud to the jury a confession statement he denied making and refused to sign; (3) the trial court abused its discretion when it failed

to enforce his subpoena to compel the appearance of an eyewitness to the shooting that would testify that he was not the shooter; (4) the trial court abused its discretion in sentencing him to 70 years' imprisonment; and (5) his consecutive sentences must be vacated pursuant to the holding in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). For the following reasons, we reverse and remand.

## FACTUAL BACKGROUND

On August 25, 1996, at approximately 10 p.m., gunshots were fired at a passing car occupied by members of the New Breed-Gangster Disciples street gang. Travis Hughes, an occupant in the car, was killed. Latonya Lemon, an innocent bystander, was severely injured.

Bree Harrington testified that on August 25, 1996, at about 10 p.m., she and Latonya Lemon, also known as Pig, were sitting on a bench at Wilcox and Pulaski, engaged in a conversation, when she heard gunshots. Harrington testified that approximately 15 feet from where she was sitting, she saw defendant standing in the street, shooting toward Pulaski. She saw defendant shoot his handgun about two times. The streetlights provided good lighting. She and Lemon were between where defendant was shooting and Pulaski. Harrington ran down Wilcox, away from Pulaski, and ducked behind a parked car. Lemon ran toward Pulaski. Harrington heard about three more gunshots after she had ducked behind the parked car.

Harrington testified that after the shooting stopped, she saw Lemon lying on the ground at the corner of Pulaski. Lemon looked like she was bleeding from a neck wound. Defendant, who was standing a couple of feet away from Lemon, asked her if she had been shot; specifically, defendant asked, "Pig, are you shot, did I hit you?" Harrington testified that she then ran over to Lemon and called her name. Defendant ran away from the scene, north up Pulaski.

In a suppression hearing that was held prior to defendant's jury trial, the defendant unsuccessfully moved to suppress his confession statement on the ground that it was not voluntarily given. The following relevant facts were presented at the suppression hearing. On August 28, 1996, at approximately two o'clock in the morning, defendant, then 14 years old, was arrested at his mother's home for the shooting that occurred on August 25, 1996, in which Travis Hughes died and Latonya Lemon was severely injured.

Detective Kato testified that after defendant was taken into custody he was advised of his *Miranda* and juvenile rights while he was in the squad car being transported to the Area 4 police station. Defendant's mother, Ms. McDaniel, was not present when defendant

was read his *Miranda* and juvenile rights. Prior to taking defendant from the apartment, Detective Kato informed Ms. McDaniel that defendant was being transported to Area 4 for questioning in connection with a shooting. Ms. McDaniel responded that she would get transportation to Area 4.

Detective Kato testified that he and defendant arrived at Area 4 around 2:25 a.m., and Ms. McDaniel was not at the station when they arrived. Detective Kato testified that Ms. McDaniel arrived at Area 4 approximately 20 minutes to half an hour later. Detective Kato escorted defendant into the interview room, but he never individually interviewed him. Detective Kato testified that he was never alone with the defendant in the interview room and the defendant was not handcuffed. Detective Kato testified that when the defendant was told what he was being charged with he responded that he wanted to make a statement. Detective Kato testified that the defendant also stated that he did not want his mother present when he gave the statement. Detective Kato then informed defendant that he could not give a statement until the assistant State's Attorney and the youth officer arrived. Defendant remained in the interview room from approximately 2:20 a.m. to 8 a.m., except for one or two times when he was escorted to the washroom.

Detective Kato testified that he first spoke to Ms. McDaniel at Area 4 when she arrived at the station around 3 a.m. She wanted to know about the investigation but did not ask to see the defendant. Detective Kato next spoke with Ms. McDaniel shortly after 8 a.m., after Assistant State's Attorney (ASA) Robert Heilingoetter had interviewed the defendant.

The defendant was interviewed at approximately 8 a.m. Detective Kato testified that he was present for the interview along with youth officer Small, ASA Heilingoetter, and the defendant. The ASA introduced himself to the defendant and then he read defendant his *Miranda* and juvenile rights. Defendant responded that he understood his rights and wanted to give a statement. Defendant was alert and responsive during the interview, and he answered questions appropriately. The interview lasted for about half an hour. At the conclusion of the interview, the defendant chose to have his oral statement memorialized as a handwritten summary. He then told the ASA that he wanted to speak to his mother. Detective Kato left the interview room, found Ms. McDaniel and personally escorted her back to the interview room where defendant was located, but he never informed her that defendant had made a confession. The only time Ms. McDaniel was made aware of the defendant's confession was when the ASA read defendant's handwritten statement back to him.

After ASA Heilingoetter prepared defendant's handwritten statement, the ASA, youth officer Small and Detective Kato all returned to the interview room where the defendant was waiting with his mother. The ASA read back the handwritten statement to the defendant, whereupon the defendant stated that he had not said the things that were contained in the handwritten statement, and he refused to sign it. When the defendant refused to sign the handwritten statement, Detective Kato, ASA Heilingoetter and youth officer Small all signed their names to the handwritten statement, in the presence of the defendant and Ms. McDaniel.

Detective Kato testified that neither he nor any of his fellow officers, in his presence, ever removed a handgun from a holster and placed it on a table in front of the defendant.

ASA Heilingoetter testified that on August 28, 1996, at approximately 8:15 a.m., he interviewed defendant at Area 4, in the presence of Detective Kato and youth officer Small. Prior to interviewing the defendant, ASA Heilingoetter was briefed by Detective Kato. ASA Heilingoetter was informed that the defendant was 14 years old and that his mother, Ms. McDaniel, was present at Area 4. ASA Heilingoetter testified that Detective Kato told him that the defendant did not want his mother present in the interview room when he gave his statement.

Immediately before the interview began, ASA Heilingoetter introduced himself to the defendant and then read defendant his *Miranda* and juvenile rights. Defendant responded that he understood his rights and that he wanted to make a statement. During the interview, defendant was cooperative and responsive to questions regarding the shooting incident and he did not appear to be sleepy, drowsy, or frightened. The interview lasted approximately 20 minutes. At the conclusion of the interview, the defendant chose to have his oral statement memorialized as a handwritten statement. ASA Heilingoetter then asked defendant if he needed anything. Defendant responded that he wanted to speak to his mother. Prior to this time, the defendant had not asked to speak to his mother. The ASA then instructed Detective Kato to bring defendant's mother to the interview room. When the ASA was alone with defendant, he asked him how the police had treated him. Defendant responded that he had been treated fine. Defendant also responded that no threats or promises had been made to him in return for his statement.

ASA Heilingoetter testified that around 8:55 a.m. he left the interview room for approximately 20 minutes to prepare the defendant's handwritten statement. After the handwritten statement was prepared, ASA Heilingoetter, Detective Kato, and youth officer Small

returned to the interview room, where the defendant was waiting with his mother, Ms. McDaniel. ASA Heilingoetter testified that this was the first time he had seen Ms. McDaniel. He testified that he did not recall if he ever explained to Ms. McDaniel what defendant had been charged with. After the ASA read the defendant's handwritten statement back to him, out loud, and asked defendant to sign the statement, defendant refused to sign, responding that he had not made such an oral confession. ASA Heilingoetter testified that he never heard Ms. McDaniel tell defendant not to sign the handwritten statement. He also testified that the summarized handwritten statement was substantially of the same content as his prior oral conversation with the defendant.

After ASA Heilingoetter finished testifying, the State rested and defendant's motion for a directed verdict was subsequently denied. Defendant then presented the testimonies of Ms. McDaniel and police officer Cleon Sykes. Defendant testified on his own behalf.

Ms. McDaniel testified that on August 28, 1996, at approximately 2 a.m., police detectives knocking at her back door awakened her. She admitted the detectives into her apartment, and they asked if the defendant was in the apartment. Defendant was awakened and subsequently taken to Area 4. Contrary to Detective Kato's testimony on this matter, Ms. McDaniel testified that she rode in the same squad car with the defendant as they were transported to Area 4. She and defendant arrived at Area 4 at approximately 2:30 a.m. and were subsequently separated. Defendant was taken to a room and she was left sitting in a waiting area. Ms. McDaniel testified that after 2:30 a.m. she did not see defendant again until later that afternoon, even though she repeatedly asked police officers to allow her to speak to the defendant.

Ms. McDaniel further testified that at approximately 4 a.m. she used a pay phone in Area 4 to call police officer Cleon Sykes at her home. Officer Sykes is the defendant's godmother. Ms. McDaniel hoped that Officer Sykes would be able to help her find out why the police had taken defendant and how she could get to see him. Officer Sykes advised Ms. McDaniel to return to the front desk and ask the police officer on duty if she could see the defendant. Ms. McDaniel also placed a second phone call to Officer Sykes that morning.

Ms. McDaniel testified that when a police officer finally came and escorted her to the interview room to see the defendant, the officer informed her that the defendant had confessed to murder. She testified that this was the first time she was told what defendant had been charged with. Ms. McDaniel testified that when she saw the defendant in the interview room there were two police officers with him. Defen-

dant was not handcuffed, he was not crying and there were no marks on his face. Ms. McDaniel testified that when ASA Heilingoetter read the statement back to defendant, she listened and made no comments. After the ASA had finished reading the statement, she asked defendant if he had made such a confession, and when defendant denied making the confession, she told him not to sign the statement.

Officer Sykes testified that she met Ms. McDaniel at the church they both attend. She is the defendant's godmother. Officer Sykes testified that on August 28, 1996, at around 2 a.m., she received a phone call at her home from Ms. McDaniel, who was calling from Area 4. Ms. McDaniel wanted to know why defendant had been arrested and why she had not been allowed to see him. Officer Sykes told Ms. McDaniel that she would not see defendant until she spoke to the police and to call her back after she had done so. Officer Sykes received a second phone call from Ms. McDaniel at around 6 a.m. Ms. McDaniel was still at Area 4, and she still had not seen the defendant. Officer Sykes then informed Ms. McDaniel that she probably would not be able to see the defendant until a youth officer arrived at Area 4. Officer Sykes testified that she did not call Area 4 on Ms. McDaniel's behalf because she did not know why the police were holding the defendant, stating that she does not interfere in police business and that she knew Ms. McDaniel would call her back with further information.

Defendant testified that when the police arrested him he was at home asleep on his mother's couch. One of the detectives informed him that he was being taken down to Area 4 for questioning. Defendant testified that the arresting detective never read him his rights and did not inform him why he was being taken to Area 4 for questioning. Defendant and his mother rode in the same squad car to the Area 4 police station. When they arrived at Area 4, Detective Kato took defendant to an interview room and his mother was taken to an unknown area of the police station. Defendant did not see his mother again until ASA Heilingoetter read the handwritten statement back to him.

Defendant testified that Detective Kato took him to three different rooms at the Area 4 police station. In the first room, Detective Kato took a black handgun and placed it on a table in front of defendant, with the gun's barrel pointed at him. The detective then took defendant's Bible, which he had received from his mother, and told him to "cut the bullsh-t." He told defendant that witnesses had identified him as the shooter. Defendant responded that he did not shoot anyone and that Detective Kato was lying. Detective Kato then took his hand and slapped defendant on the right side of his face. Defendant started crying and asked Detective Kato why he was doing this.

Detective Kato told defendant to stop acting like a little church kid, that he was a murderer and the enforcer for the Black Souls street gang, and that he would go to jail for life if he did not cooperate by giving a statement. Defendant testified that he was in this first room for about 15 minutes.

Defendant testified that Detective Kato took him to a second room after he refused to cooperate. Detective Kato handcuffed him behind his back and then attached one handcuff to a steel pole. The detective then told him that he would remain in the room until he was ready to talk. Defendant testified that he remained in this second room for a long time. He was eventually taken to a third room where the interview with the ASA subsequently took place.

Defendant testified that he was not read his *Miranda* or juvenile rights until about five minutes before he was transferred to the juvenile detention center. He testified that he never made the oral confession that was included in the summarized handwritten statement prepared by ASA Heilingoetter. He also testified that he was scared when he arrived at Area 4 because even though he had been arrested for disorderly conduct, this prior arrest occurred when he was younger, he was never charged with a crime, and he was immediately released into his mother's custody.

Defendant further testified that he asked Detective Kato on two separate occasions if he could speak to his mother. On the first occasion, Detective Kato told him that he could not see his mother until the detective was ready for him to see her. On the second occasion, Detective Kato told him to quit asking for his mother and to stop acting like a "b---h," because he was not going to see his mother until he decided to cooperate. Defendant testified that ASA Heilingoetter finally allowed him to see his mother. Defendant testified that after he refused to sign the handwritten statement and was alone in the interview room, Detective Kato returned to the room, looked at him and shook his head, but the detective did not say anything.

Defendant also testified that the ASA never asked him how the police had treated him. Defendant denied that he ever told Detective Kato that he did not want his mother in the interview room when he was being questioned. Defendant further testified that ASA Heilingoetter never questioned him about the case before the handwritten statement was read back to him. He testified that the ASA basically told him that he had done the shooting.

Youth officer Small testified in rebuttal, on behalf of the State. She testified that she was present in the interview room with Detective Kato, ASA Heilingoetter, Ms. McDaniel and the defendant when ASA Heilingoetter read defendant's handwritten statement back to him,

out loud. After the defendant refused to sign the handwritten statement, she took him into custody and began processing him at approximately 9:30 a.m. At approximately 9:55 a.m. defendant was taken to the lockup to be fingerprinted and photographed.

On cross-examination, youth officer Small testified that she had seen Ms. McDaniel prior to the defendant's interview with the ASA. Ms. McDaniel was standing in the hallway. Youth officer Small testified that she never introduced herself to Ms. McDaniel and she never spoke to her. She testified that during defendant's interview with the ASA, defendant was not nervous and he appeared to be fine. The ASA conducted the interview, which started around 8 a.m. and lasted about 20 minutes.

In response to questioning by the court, youth officer Small testified that the ASA asked defendant questions during the interview and defendant responded to those questions. She further testified that she heard the ASA read back the handwritten statement to the defendant and that the handwritten statement was substantially the same as the previous conversation between defendant and the ASA.

The trial court subsequently denied defendant's motion to suppress his confession statement, ruling that Detective Kato, ASA Heilingoetter, and youth officer Small all testified credibly and consistently regarding defendant making the statement. The trial court determined that defendant had made a statement and that his denial in this regard damaged his credibility as to everything else he testified to.

The trial court reasoned that if the State had truly attempted to prevent Ms. McDaniel from seeing the defendant and influencing him regarding his confession, then the State would not have allowed her to see him until after he had signed the handwritten statement. The trial court also found that the defendant's allegations of physical contact were unfounded because he had filed a motion to suppress and an amended motion to suppress neither of which contained allegations of physical contact. There was no evidence in the record that defendant complained to anyone of being physically abused. Defendant only alleged physical contact at the present hearing.

## ANALYSIS

### I. Voluntariness of Defendant's Confession

#### A. Standard of Review

Defendant first contends that his confession was involuntary under the totality of the circumstances, and therefore, the trial court erred in failing to grant his motion to suppress his confession statement.

■ Traditionally, the proper standard of review in Illinois for determining whether a defendant's confession was voluntary has been the manifestly erroneous standard. See *People v. Oaks*, 169 Ill. 2d 409, 447, 662 N.E.2d 1328 (1996). Recently, however, the Illinois Supreme Court has adopted a two-step approach where the trial court's factual findings and credibility determinations are reviewed for manifest error, after which the reviewing court applies a *de novo* standard of review to the legal determination of whether suppression of the evidence is warranted under those facts. *In re G.O.*, 191 Ill. 2d 37, 727 N.E.2d 1003 (2000); *People v. F.J.*, 315 Ill. App. 3d 1053, 1056, 734 N.E.2d 1007 (2000). Still, in cases where neither the facts nor the credibility of the witnesses is at issue, the reviewing court proceeds with a strictly *de novo* review. See *People v. Carlson*, 185 Ill. 2d 546, 551, 708 N.E.2d 372 (1999). In the present case, however, the credibility of the witnesses was very much at issue, and therefore, our review proceeds under the two-step approach adopted by the Illinois Supreme Court in *In re G.O.*

### 1. Manifest error review

■ In reviewing a trial court's ruling on a motion to suppress, the trial court's factual determinations and credibility assessments will be reversed only when they are against the manifest weight of the evidence. *People v. Buss*, 187 Ill. 2d 144, 718 N.E.2d 1 (1999). A trial court's judgment is against the manifest weight of the evidence when its findings appear to be unreasonable, arbitrary, or not based on the evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 647 N.E.2d 273 (1995).

■ In the instant case, the credibility of the witnesses who testified regarding events that occurred at the Area 4 police station was at issue. The trial court found that Detective Kato, ASA Heilingoetter, and youth officer Small were all credible and that the defense witnesses were not credible. Specifically, the trial court found that: (1) the defendant stated that he did not want his mother present during his questioning; (2) while defendant's mother was at the Area 4 police station, she never asked to see the defendant; (3) the defendant was advised of his rights by Detective Kato and ASA Heilingoetter; (4) the defendant was not physically abused or threatened in any way, including the placing of a handgun on a table in front of defendant, with the gun's barrel pointed at the defendant; and (5) the defendant agreed to give a confession statement, he was cooperative and responsive to questions, and was treated well.

Our review of the record shows that the trial court's factual findings were against the manifest weight of the evidence. Significantly, the trial court should have found that the defendant's mother asked

to see defendant several times between 2:30 a.m. and 8 a.m. and that each time her requests were denied. It is not believable that the defendant's mother waited at the Area 4 police station for over five hours, twice calling Officer Sykes for advice on how she could see her son, without asking to see the defendant. Moreover, if Detective Kato was not truthful regarding Ms. McDaniel's efforts to see defendant, then the rest of his testimony is suspect as to believability, especially the detective's assertion that the defendant did not want his mother present during his questioning.

Since we find that the trial court's determination concerning witness credibility was against the manifest weight of the evidence, we will conduct a *de novo* review of the defendant's legal challenge under the defense witnesses' versions of events. *Cf. People v. Gonzalez*, 184 Ill. 2d 402, 412, 704 N.E.2d 375 (1998).

## 2. *De novo* review

■ The test to determine whether a juvenile's confession was voluntary is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the juvenile as well as the details of the interrogation. *In re M.W.*, 314 Ill. App. 3d 64, 69, 731 N.E.2d 358 (2000); *People v. Ball*, 322 Ill. App. 3d 521, 531, 750 N.E.2d 719 (2001). In the instant case, given the totality of the circumstances including defendant's age, his lack of criminal experience, the time of his arrest, and his long period of detention without the opportunity to confer with a concerned adult, a *de novo* review clearly shows that the defendant's confession was involuntary and, therefore, should have been suppressed.

## B. Factors Reviewing Court Considers in Determining Whether a Minor's Confession was Voluntary

The receiving of an incriminating statement by a juvenile in the absence of counsel is a sensitive concern requiring great care to assure that the juvenile's admission was not coerced or suggested, or the product of ignorance of one's rights, adolescent fantasy, fright or despair. *People v. Montanez*, 273 Ill. App. 3d 844, 853, 652 N.E.2d 1271 (1995); *People v. Prude*, 66 Ill. 2d 470, 476, 363 N.E.2d 371 (1977). In cases involving juveniles, courts must be particularly careful in scrutinizing the record, since juveniles can easily become victims of the law. *People v. Travis*, 122 Ill. App. 3d 671, 674, 462 N.E.2d 654 (1984).

To be admissible at trial, a confession must be free, voluntary, and not obtained by any direct or implied promises or by the exertion of any improper influence. *People v. Thomas*, 137 Ill. 2d 500, 516, 561

N.E.2d 57 (1990). Factors that are considered in determining whether a confession was voluntary include a defendant's individual characteristics, such as his age, intelligence, education, physical condition and experience with the criminal justice system; the nature of the interrogation is also considered, such as the legality and duration of the detention, the duration of the questioning, and any physical or mental abuse by the police. *In re A.R.*, 295 Ill. App. 3d 527, 533, 693 N.E.2d 869 (1998); *People v. Gilliam*, 172 Ill. 2d 484, 500-01, 670 N.E.2d 606 (1996).

In cases involving juveniles, additional factors must be considered, such as the time of day of the questioning and the presence of a parent or other adult concerned with the juvenile's welfare. *In re Lashun H.*, 284 Ill. App. 3d 545, 551, 672 N.E.2d 331 (1996), citing *People v. Brown*, 235 Ill. App. 3d 479, 601 N.E.2d 1190 (1992); *In re L.L.*, 295 Ill. App. 3d 594, 693 N.E.2d 908 (1998). No single factor is dispositive. *Gilliam*, 172 Ill. 2d at 500. The voluntariness of a confession is determined by the circumstances of each case. *In re J.J.C.*, 294 Ill. App. 3d 227, 238, 689 N.E.2d 1172 (1998).

In the instant case, although the defendant had some prior minimal experience with the criminal justice system and he professed to understand his constitutional rights, the totality of the circumstances—particularly his youth, the fact that the police frustrated his mother's attempts to confer with him, the absence of an effective friendly adult during his interrogation, and the time and circumstances of his arrest—rendered his statements involuntary.

1. Defendant's age and prior contact with criminal justice system

First, the record reveals that defendant was 14 years old at the time of his arrest and interrogation and that he had very little prior contact with the criminal justice system. Therefore, it is unlikely that defendant was sophisticated enough to protect his rights during a police interrogation, without the aid of counsel or a concerned parent. See *In re J.J.C.*, 294 Ill. App. 3d at 238 (stating that juvenile's prior minimal contacts with the police did not give him the sophistication or insight on how to conduct himself while being interrogated by the police in a criminal matter). In *Gallegos v. Colorado*, 370 U.S. 49, 8 L. Ed. 2d 325, 82 S. Ct. 1209 (1962), the United States Supreme Court addressed how the youth of a juvenile defendant can be a significant factor in determining the voluntariness of the juvenile's confession:

> "The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a

person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." *Gallegos*, 370 U.S. at 54, 8 L. Ed. 2d at 328, 82 S. Ct. at 1212.

In the present case, the fact that the defendant was only 14 years old at the time of his arrest and interrogation and had only limited prior contact with the criminal justice system puts this case on equal footing with *Gallegos*.

## 2. Parent absent during defendant's interrogation

Second, the evidence demonstrates that the police frustrated the defendant's mother's attempts to confer with the defendant prior to his police interrogation. The presence or absence of a parent is a major factor to consider when determining the voluntariness of a juvenile's confession. *In re S.D.S.*, 103 Ill. App. 3d 1008, 1012, 431 N.E.2d 759, 762 (1982). If a parent or concerned adult indicates an interest by his or her presence, then he or she should be allowed to confer with the juvenile before any questioning begins, as well as be present when any questioning occurs. *In re J.O.*, 231 Ill. App. 3d 853, 854-55, 596 N.E.2d 1285, 1287 (1992); *Montanez*, 273 Ill. App. 3d at 852-53, 652 N.E.2d at 1278; *In re Lashun H.*, 284 Ill. App. 3d at 553, 672 N.E.2d at 336; *In re J.J.C.*, 294 Ill. App. 3d at 234-37, 689 N.E.2d at 1178-80; *In re L.L.*, 295 Ill. App. 3d 594, 601, 693 N.E.2d 908, 914 (1998).

It is well established that police conduct that frustrates a parent's attempts to confer with his or her child prior to or during questioning is a significant factor in determining whether the child's confession was voluntary. *In re V.L.T.*, 292 Ill. App. 3d 728, 737, 686 N.E.2d 49 (1997); *In re Lashun H.*, 284 Ill. App. 3d at 553; *People v. Knox*, 186 Ill. App. 3d 808, 814, 542 N.E.2d 910 (1989); *In re J.J.C.*, 294 Ill. App. 3d at 237 (holding that when a juvenile's parents are present and request to confer with their child, and they are effectively refused access to the child, the presumption arises that the juvenile's will was overborne).

Our supreme court has recently refused to adopt a *per se* rule requiring the suppression of a juvenile's confession where he is denied the ability to confer with a concerned adult either before or during his interrogation. *In re G.O.*, 191 Ill. 2d at 55. Nonetheless, the supreme court found that the "concerned adult" factor is particularly relevant in determining whether a juvenile's confession was voluntary in situations where the police prevent the juvenile's parents from speaking with him. *In re G.O.*, 191 Ill. 2d at 55.

It is the "concerned adult" factor that makes this case distin-

guishable from *In re G.O.* In *In re G.O.*, the supreme court determined that the testimony revealed that the police never frustrated any attempts by the juvenile's mother to confer with him. *In re G.O.*, 191 Ill. 2d at 56. Here, however, the testimony revealed that the detectives clearly frustrated defendant's mother's attempts to confer with the defendant. The record shows that Ms. McDaniel arrived at Area 4 either around 2:20 a.m. with defendant or shortly thereafter around 3 a.m. Ms. McDaniel testified that she made numerous requests to the police to allow her to see defendant. The record shows that she twice telephoned police officer Sykes at the officer's home, in an attempt to find out how she could contact defendant. Officer Sykes is defendant's godmother. Ms. McDaniel testified that Officer Sykes advised her to return to the front desk and ask the officer on duty if she could see the defendant. Ms. McDaniel testified that after her further requests to see the defendant were unsuccessful, she placed a second phone call to Officer Sykes that morning.

Officer Sykes' testimony corroborated Ms. McDaniel's testimony regarding her efforts to see defendant at Area 4. Officer Sykes testified that on August 28, 1996, at approximately 2 a.m., she received a telephone call at home from Ms. McDaniel, who was calling from Area 4. Ms. McDaniel wanted to know why defendant had been arrested and why she had not been allowed to see him. Officer Sykes informed Ms. McDaniel that she probably would not be allowed to see the defendant until she spoke to the police and to call her back after she had done so. Officer Sykes testified that she received a second phone call from Ms. McDaniel at around 6 a.m. Ms. McDaniel was still at Area 4 and she still had not seen the defendant. Ms. McDaniel was not allowed to see defendant until after 8 a.m. when he had already made an oral confession.

Detective Kato testified that Ms. McDaniel never asked him if she could see the defendant. It is highly unlikely that Ms. McDaniel would have traveled to Area 4 and remained there from 2:20 a.m. to approximately 8 a.m. without asking to see the defendant. See *In re Lashun H.*, 284 Ill. App. 3d at 555 (holding that it goes against common sense to assume that a mother would remain at a police station for over six hours without asking to see her son); *In re L.L.*, 295 Ill. App. 3d at 603 (stating that the court could not accept State's implied theory that parents were not interested in seeing and conferring with their son, where they drove to the police station in the middle of the night).

The State contends that the defendant requested that his mother not be present during his questioning and that this therefore rendered his confession voluntary. However, courts have specifically held that

such an argument "blatantly disregards the interest of the parents in wishing to confer with their child before questioning." *In re J.J.C.*, 294 Ill. App. 3d at 237. In *People v. Brown*, 182 Ill. App. 3d 1046, 1053-54, 538 N.E.2d 909 (1989), the court held that when a parent is present at the police station and shows an interest in seeing his or her child, the police have an affirmative duty to stop questioning the child and allow the parent to confer with the child. See also *In re J.O.*, 231 Ill. App. 3d at 854-55 (agreeing with the State that there is no *per se* rule that juveniles must be allowed to consult with their parents prior to questioning, but stating that if parents indicate an interest by their presence, then they should be allowed to confer with their children before any questioning begins, as well as be present when any questioning occurs).

In the instant case, the record reveals that Ms. McDaniel arrived at Area 4 either along with defendant or shortly after he arrived, and that she immediately asked to see him. Under these circumstances and based on the holdings in *Brown*, *In re J.J.C.*, and *In re J.O.*, the detectives should have allowed Ms. McDaniel to confer with the defendant once she arrived at Area 4 and they should have allowed her to be present during his questioning, even if he requested that she not be present.

### 3. Presence of youth officer

Third, the record also shows that the mother's absence from the defendant's interrogation was not offset by the presence of the assigned youth officer. The facts reflect that the youth officer showed no interest in protecting the defendant's rights. For example, youth officer Small testified that she saw Ms. McDaniel standing in a hallway at Area 4 prior to defendant's interrogation, but she never spoke with her. Moreover, she testified that she never spoke with the defendant, and during the defendant's interrogation she never made a comment. Consequently, these facts clearly show that youth officer Small did not take an interest in protecting the defendant's welfare. See *In re J.J.C.*, 294 Ill. App. 3d at 237 (noting that the record was silent on whether the youth officer affirmatively protected respondent minor's rights); *In re L.L.*, 295 Ill. App. 3d at 601 (the record and trial court's comments revealed that youth officer showed no interest in minor's welfare).

### 4. Time and circumstances of defendant's arrest

Fourth, the arrest of defendant at his mother's home at two o'clock in the morning also contributed to the coercive nature of the defendant's interrogation. For example, in *In re J.O.*, the court held that a juvenile's confession was involuntary where he was arrested in

the middle of the night and the police prevented his parents from seeing him. *In re J.O.*, 231 Ill. App. 3d at 854; see also *In re J.J.C.*, 294 Ill. App. 3d at 235-36 (holding that coercive nature of juvenile's encounter with the police began when he was arrested at home and was transported to police station where his parents were denied access to him).

In the instant case, the defendant was arrested at approximately 2 a.m., at his mother's home after he was awakened by the detectives. Defendant was then transported to the Area 4 police station, where his mother was denied access to him. This police conduct contributed to the coercive nature of defendant's interrogation.

The case of *Haley v. State of Ohio*, 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302 (1948), is instructive, where more than half a century ago the United States Supreme Court found that the confession of a 15-year-old, who was convicted of murder and sentenced to life imprisonment, was involuntary. The boy's confession was obtained after five hours of late-night interrogation outside the presence of his parents and attorney:

> "[W]hen, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of the night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning." *Haley*, 332 U.S. at 599-600, 92 L. Ed. at 228-29, 68 S. Ct. at 303-04.

Neither time nor intervening case law has lessened the force and elegant logic of *Haley*. See *United States v. Young*, No. 01 C 3963 (N.D. Ill. September 13, 2001).

Considering all of the above factors in relation to the totality of the circumstances shows that the defendant's confession was involuntary and, therefore, should have been suppressed.

## II. Admissibility of Defendant's Unsigned Confession Statement

Defendant next argues that the trial court erred when it allowed ASA Heilingoetter to read defendant's confession statement (State's exhibit No. 25) to the jury because he did not sign the statement and it was not transcribed. We do not need to reach this issue because we have found that the trial court erred in not suppressing the defendant's confession.

## III. Conclusion

Based on the totality of the circumstances under *de novo* review, this court finds that the defendant's confession was involuntary. This case is reversed and remanded for a new trial without the confession based on the following factors: (1) defendant was 14 years old at the time of his arrest and interrogation and had very limited prior contact with the criminal justice system; (2) police conduct frustrated defendant's mother's attempts to confer with defendant prior to his interrogation; (3) the assigned youth officer showed no interest in protecting defendant's welfare; and (4) the timing and circumstances of defendant's arrest contributed to the coercive nature of his interrogation.

Since we have decided that this case should be retried, we will not address defendant's sixth amendment argument or the issues regarding the length of defendant's sentence or the imposition of consecutive sentences.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is reversed and this cause remanded for further proceedings.

Reversed and remanded.

WOLFSON and BURKE, JJ., concur.