# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Patterson*, 2012 IL App (1st) 101573

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD PATTERSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-10-1573 |
| Filed | June 29, 2012 |
| Rehearing denied | September 20, 2012 |
| Modified upon denial of rehearing | September 26, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The constitutionality of section 5-130 of the Juvenile Court Act, which provides for the automatic transfer of minor defendants at least 15 years old charged with certain offenses, including aggravated criminal sexual assault, to criminal court was upheld, but the cause was remanded for a new trial due to the erroneous admission of defendant's inculpatory statement. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-1455; the Hon. Ellen Beth Mandeltort, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Christopher Kopacz, all of
State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg,
Douglas P. Harvath, and Jessica R. Bargmann, Assistant State's
Attorneys, of counsel), for the People.

Panel

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Justices Steele and Murphy concurred in the judgment and opinion.


**OPINION**


¶ 1    The trial court entered judgment on a jury verdict finding Ronald Patterson, a minor,
guilty on three counts of aggravated criminal sexual assault. On appeal, Patterson argues that
the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2008)), in its provision for
automatic transfer of certain cases to criminal court for the prosecution of minor defendants
as adults, violates the state and federal constitutions. Patterson also challenges the trial
court's decision to admit into evidence a statement Patterson signed at the police station and
the decision to bar evidence that the alleged victim had sexual intercourse with a different
man before the doctor examined her.

¶ 2    We follow other cases upholding the constitutionality of the automatic transfer provision
in the Juvenile Court Act (705 ILCS 405/5-130 (West 2008)). But we find that the trial court
erred when it allowed into evidence a statement Patterson signed at the police station,
because police did not attempt to contact Patterson's parents, and no concerned adult helped
Patterson during questioning. We also hold that on remand, if the prosecution again presents
testimony that physical findings show that the alleged victim had sexual intercourse shortly
before her medical examination, the court should permit Patterson to present evidence that
the alleged victim had intercourse with her boyfriend. We reverse and remand for a new trial.


¶ 3                                    BACKGROUND

¶ 4    On Sunday, December 14, 2008, after 5 p.m., E.C., who worked for Streamwood
Behavioral Health Systems (SBHS), drove an SBHS van to Hinsdale to pick up Ronald
Patterson, then 15 years old, at the end of Patterson's visit with his family. E.C. and Patterson
returned to the SBHS facility where Patterson lived around 6:30 p.m. Once Patterson
returned to his living unit, with the doors locked, E.C. told a coworker that Patterson had
raped her. E.C. and her coworker called police, who came to SBHS and talked to E.C. An
ambulance took E.C. to a hospital where a doctor examined her and photographed her bruises
and some areas of scraped skin.

¶ 5 Police arrested Patterson at the SBHS facility around 9 p.m. that evening, and took him to the Schaumburg police station. Detective Joe Kaminski interviewed E.C. at the station and then, shortly before 10 p.m., he called Stephen Kehoe, the director of the SBHS facility that housed Patterson, and left him a message notifying him that police intended to question Patterson about the incident with E.C. Detective Kaminski also called and left a message for Patterson's caseworker shortly before 10 p.m. No officer made any attempt to contact Patterson's parents.

¶ 6 Police began questioning Patterson two minutes after Detective Kaminski left his message for Patterson's caseworker. Detective Kaminski acted as the youth officer, while Detective John Atamian questioned Patterson. Initially, Patterson told Detective Atamian that E.C. said she wanted to have sex with Patterson and that he agreed. After further questioning, Patterson signed a typewritten statement. According to the statement, Patterson admitted that he forced E.C. to perform and receive oral sex, and to have vaginal intercourse with him. A grand jury charged Patterson with three counts of aggravated criminal sexual assault, with one count for each form of contact. The Juvenile Court Act required the court to try Patterson as an adult. 705 ILCS 405/5-130(1)(a) (West 2008).

¶ 7 The court ordered a psychological evaluation of Patterson. The psychiatrist found Patterson fit for trial, legally sane at the time of the alleged offense, and able to understand *Miranda* warnings.

¶ 8 Patterson filed a motion to suppress his typewritten statement. In the motion, he alleged that he was "a special education student with limited reading comprehension and comprehension skills." However, neither party presented any evidence at the hearing on the motion concerning Patterson's intelligence and education. Patterson testified that police did not read him his rights before he signed the typewritten statement. He admitted that he initialed the part of the typewritten statement that set out the *Miranda* rights. The prosecution presented no evidence of any prior arrests of Patterson. Detective Kaminski testified that he read Patterson his rights at 10 p.m., directly before Detective Atamian started questioning Patterson.

¶ 9 Kaminski admitted that he did not speak to Kehoe, but he testified that another officer told Kaminski that Kehoe gave police permission to question Patterson. Kehoe testified that he did not recall giving police such permission and that he lacked authority to give such permission because he was not Patterson's legal guardian. The director of DCFS served as Patterson's legal guardian. No officer attempted to contact the director of DCFS.

¶ 10 The trial court found credible Kaminski's testimony that he read Patterson his rights and the psychiatrist's report stating that Patterson could understand those rights. The court made no finding on the issue of whether Kehoe told police they had his permission to question Patterson. The court specifically held that the "police made reasonable inquiries to try to interview" Patterson. The trial court denied the motion to suppress.

¶ 11 At trial, E.C. testified that while she was driving Patterson from Hinsdale to the SBHS facility, he grabbed her arm and told her to exit from the highway. Because he weighed much more than twice E.C.'s weight, E.C. decided to take the exit. Patterson directed E.C. to a parking lot near some empty buildings. She tried to reach her cell phone, but he slapped it

out of her hand. She opened the door and tried to run, but Patterson grabbed her coat. As he got out of the van, he ripped out a global positioning device that E.C. had plugged into the van's cigarette lighter. The frayed cord fell onto the parking lot. E.C. tried to strike Patterson, but her blows had no effect. Patterson pushed E.C. against the van's side door, pinning her against the van.

¶ 12    E.C. testified that Patterson slid the door open and pushed E.C. into the van. When she tried to scramble to the door on the other side of the van, Patterson grabbed her feet and pulled her back, saying "Don't make me hurt you." He ripped off her jeans, then he pulled down his pants and choked her to get her to open her mouth. He put his penis in her mouth for perhaps 30 seconds. He pushed her legs apart and put his tongue in her vagina. He then shoved his penis into her vagina for 30 seconds. When he pulled out, without ejaculating, he laid on top of E.C., hugged her and told her he loved her. They dressed and got out of the van, and they found E.C.'s cell phone in the parking lot. E.C. then drove back to the SBHS facility. When she returned to the parking lot later that night with a police officer, they found the cord that had been ripped from E.C.'s global positioning device.

¶ 13    An officer took pictures, admitted into evidence, showing the cord in the parking lot and the van's door with an area that showed cloth had rubbed against the side door. The officer who talked with E.C. at SBHS testified that she saw a red mark on E.C.'s neck, but she did not make any reference to that mark in her report. Pictures of E.C. taken at the hospital show some fresh scrapes, bruises, and redness, but her throat had, at most, a very slight discoloration.

¶ 14    The doctor who examined E.C. on December 14 testified that he found several bruises on E.C.'s arms and hip. He did not note any marks on E.C.'s neck. He swabbed her vagina. The parties stipulated that laboratory tests of the swab did not contain any of Patterson's DNA. The doctor testified that he used a speculum to look into E.C.'s vagina, and he found redness on the cervix consistent with recent sexual intercourse.

¶ 15    Patterson sought to introduce evidence that the swab taken from E.C.'s vagina included semen with DNA from E.C.'s boyfriend. Defense counsel explained that he needed to rebut the inference that the reddened cervix showed that E.C. had intercourse with Patterson, when intercourse with her boyfriend could have produced the same effect. The trial court held that the rape shield law barred the evidence. 725 ILCS 5/115-7(a) (West 2008).

¶ 16    Detective Atamian read to the jury the typewritten statement Patterson signed. The statement corroborated E.C.'s account of the incident.

¶ 17    Patterson testified that E.C. pulled off the highway of her own accord, pulled down his pants, and performed oral sex briefly. She then drove back to SBHS. Patterson never said any of the statements attributed to him in the typewritten statement he signed. He signed it because police told him to do so.

¶ 18    The jury found Patterson guilty on all three counts of aggravated criminal sexual assault. The court denied his motion for a new trial.

¶ 19    The presentence investigation report said that Patterson tested positive for cocaine at birth. A relative of Patterson's mother adopted him at 18 months of age, and he grew up with his adoptive parents until they found they could not protect his siblings from his increasingly

-4-

violent behavior. He had extensive psychiatric treatment from the time he turned 11. The Department of Children and Family Services took custody of Patterson, at his adoptive parents' request, in 2006, when he was 13. He took Thorazine, Benadryl, Prozac, Trileptal, and Abilify, amongst other medications, to try to control his aggressive behavior and his moods. An IQ test in 2006 resulted in a full-scale score of 72.

¶ 20    School records and records from SBHS showed that Patterson acted somewhat violently on numerous occasions. He threw hot water on a teacher in 2004, tried to bite SBHS staff members when they restrained him in 2006, threatened to stab a staff member in 2006, and stabbed a staff member with a pencil in 2008. The behaviors led to some loss of privileges at SBHS and other discipline. Records also showed that at times SBHS rewarded Patterson for extended periods of good behavior.

¶ 21    The presentence investigator said in his report that Patterson had no prior police contacts. According to a printout from the police department, Patterson had one prior arrest, for throwing hot water on a teacher when he was 11, and the arrest resulted in a station adjustment.

¶ 22    The trial court found several factors in aggravation, and none in mitigation, so the court sentenced Patterson to 12 years in prison on each count, with the sentences to run consecutively, for a total sentence of 36 years. Patterson now appeals.

¶ 23                                   ANALYSIS

¶ 24    Patterson argues on appeal that the automatic transfer provision of the Juvenile Court Act violates the state and federal constitutions. He also argues that the trial court erred (1) when it denied his motion to suppress the typewritten statement, (2) when it excluded evidence that E.C.'s boyfriend could have caused the redness of E.C.'s cervix, and (3) when it sentenced him to 36 years in prison. Finally, Patterson asks us to reverse his convictions because his counsel provided ineffective assistance when he failed to present at the hearing on the motion to suppress the typewritten statement evidence that Patterson had intellectual deficits that left him especially vulnerable to police pressure to make and sign statements against his will. We apply different standards of review to the defendant's arguments.

¶ 25                              Automatic Transfer

¶ 26    Patterson first argues that the automatic transfer provision of the Juvenile Court Act imposes unconstitutionally harsh penalties on juveniles and it violates Patterson's right to due process. We review *de novo* a decision on the constitutionality of a statute. *People v. Jackson*, 2012 IL App (1st) 100398, ¶ 8.

¶ 27    Our supreme court has rejected essentially the same challenges to the constitutionality of the automatic transfer provision. See *People v. P.H.*, 145 Ill. 2d 209, 229-36 (1991); *People v. J.S.*, 103 Ill. 2d 395, 403-07 (1984). Patterson contends that we should not follow *J.S.* and *P.H.* because our supreme court decided those cases before the United States Supreme Court decided *Graham v. Florida*, 560 U.S. ___, 130 S. Ct. 2011 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005). In *Jackson*, 2012 IL App (1st) 100398, ¶¶ 14-24, *People*

*v. Salas*, 2011 IL App (1st) 091880, ¶¶ 54-80, *People v. Sanders*, 2012 IL App (1st) 102040, *People v. Croom*, 2012 IL App (4th) 100932, and *People v. Brown*, 2012 IL App (1st) 091940, the appellate court rejected indistinguishable arguments about the effect of the decisions in *Graham* and *Roper* on *J.S.* and *P.H.* All of the courts held that *Graham* and *Roper* did not affect the continuing vitality of *J.S.* and *P.H.* or the constitutionality of the automatic transfer provision of the Juvenile Court Act. We, too, follow *J.S.* and *P.H.* Accordingly, we reject Patterson's challenge to the constitutionality of the Juvenile Court Act's automatic transfer provision for juveniles at least 15 years old accused of aggravated criminal sexual assault.

¶ 28                                  Motion to Suppress

¶ 29    Next, Patterson argues that the trial court should have suppressed the typewritten statement he signed at the police station. We review the trial court's findings of fact to determine whether they are against the manifest weight of the evidence, and we review *de novo* the legal determination of whether the court should suppress the statement. *In re G.O.*, 191 Ill. 2d 37, 49 (2000).

¶ 30    The trial court found credible (1) Detective Kaminski's testimony that he read Patterson his rights before Detective Atamian began questioning him and (2) the psychiatrist's finding that Patterson could understand those rights. The weight of the evidence sufficiently supports the trial court's findings on these issues. The parties did not dispute most other facts related to the statement. Police arrested Patterson at the SBHS facility on December 14, 2008, and took him to the police station. The prosecution presented no evidence of prior arrests. Kaminski, who had taken part in the investigation by interviewing E.C., acted as the youth officer. Kaminski called two persons who worked for SBHS, on a Sunday and long after office hours, and left messages for both of them. No officer made any attempt to contact Patterson's parents, and no officer made any further attempts to find a concerned adult to help Patterson. The questioning began two minutes after Kaminski left a message for Patterson's caseworker.

¶ 31    Patterson answered the officers' questions, and he told them, just as he told the jury, that he and E.C. had consensual sexual relations. About an hour after questioning began, Patterson signed a statement that contradicted his initial account and corroborated E.C.'s account of the incident.

¶ 32    We apply the following standards to determine whether the facts make the signed statement admissible at trial:

"To be admissible at trial, a confession must be free, voluntary, and not obtained by any direct or implied promises or by the exertion of any improper influence. [Citation.] Factors that are considered in determining whether a confession was voluntary include a defendant's individual characteristics, such as his age, intelligence, education, physical condition and experience with the criminal justice system; the nature of the interrogation is also considered, such as the legality and duration of the detention, the duration of the questioning, and any physical or mental abuse by the police. [Citations.]

In cases involving juveniles, additional factors must be considered, such as the time

-6-

of day of the questioning and the presence of a parent or other adult concerned with the juvenile's welfare. [Citations.] No single factor is dispositive. [Citation.] The voluntariness of a confession is determined by the circumstances of each case." *People v. McDaniel*, 326 Ill. App. 3d 771, 781-82 (2001).

¶ 33    Reviewing courts have emphasized the special care needed in cases involving juvenile confessions when counsel is not present:

"The receiving of an incriminating statement by a juvenile in the absence of counsel is a sensitive concern requiring great care to assure that the juvenile's admission was not coerced or suggested, or the product of ignorance of one's rights, adolescent fantasy, fright or despair. [Citations.] In cases involving juveniles, courts must be particularly careful in scrutinizing the record, since juveniles can easily become victims of the law." *McDaniel*, 326 Ill. App. 3d at 781.

See *People v. Travis*, 122 Ill. App. 3d 671, 674 (1984); see also *People ex rel. Brazen v. Finley*, 119 Ill. 2d 485, 492 (1988) (citing *Leonard C. Arnold, Ltd. v. Northern Trust Co.*, 116 Ill. 2d 157, 163 (1987)). Patterson, a 15-year-old juvenile, had an especially acute need for the assistance of a concerned adult because the law required the court to try Patterson as an adult. 705 ILCS 405/5-130 (West 2008).

¶ 34    Patterson was 15 when police questioned him late in the evening on December 14, 2008. The questioning did not last long and no evidence indicates any mental or physical abuse of Patterson.

¶ 35    The State argues that we must not take into consideration Patterson's severely limited intelligence and education because Patterson's attorney failed to present evidence of Patterson's intellectual deficits at the pretrial hearing, and only the presentence investigation brought these facts to light. Patterson admits that his counsel waived consideration of his intelligence as a factor bearing on the admissibility of the typewritten statement, but Patterson contends that counsel's waiver shows ineffective assistance of counsel. For purposes of determining whether the trial court erred when it denied the motion to suppress the statement, we will not take into account the evidence of Patterson's severely limited intelligence and education. See *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1999).

¶ 36    The parties disagree on whether Patterson had prior contact with police. Patterson relies on the presentence investigation report, presented to the court after trial, which says he had no prior contacts with police. The prosecution relies on police reports, presented to the court after trial, which show an arrest in 2004, when Patterson was 11. According to the police report, the arrest resulted in a station adjustment. Even if the printout more accurately reflects Patterson's experience, Patterson had, at most, some minimal contact with police, and not in a setting where he would have learned about his need to protect his rights. The prosecution did not present even this minimal evidence of a prior arrest to the trial court at the hearing on the motion to suppress statements. From the evidence presented at the hearing, the court knew that Patterson had considerable experience with adults disciplining him for inappropriate aggressive behavior, but the discipline included no exposure to a real threat of prison time.

¶ 37    Because of Patterson's youth and lack of exposure to the criminal justice system, in this

case involving charges that require the court to try Patterson as an adult, the presence during questioning of an adult concerned with his welfare takes on special significance. See *McDaniel*, 326 Ill. App. 3d at 782-84; *In re J.J.C.*, 294 Ill. App. 3d 227, 237-38 (1998). Detective Kaminski, who investigated the charges against Patterson, also purported to act as a youth officer during questioning. We find Kaminski's role here effectively the same as the role of the youth officer in *People v. Griffin*, 327 Ill. App. 3d 538 (2002), named Begeske. In *Griffin*, the court said:

> "[I]n Illinois, even when youth officers are present, their role is unclear. One line of cases holds that a youth officer's role is to verify that minors' parents have been notified, ensure that the minors have been given *Miranda* rights, and see to it that minors are properly treated, that they are fed, given access to washroom facilities, and allowed to rest, and that they are not coerced in any way. [Citations.] Other cases find that a youth officer may not merely be present and remain silent, but must demonstrate an interest in the minors' welfare and affirmatively protect their rights. [Citations.] These cases are fact specific and each case must be evaluated on its own particular set of circumstances. [Citation.]
>
> In the present case, while the court made no factual findings as to Begeske's role as a youth officer, we find that Begeske failed to fulfill his duties under either of the above standards. Begeske did not remain a neutral observer but, rather, worked against defendant's interests. While an investigator's role is to interrogate witnesses and collect evidence, it is clear that the role of a youth officer is to act as a concerned adult interested in the juvenile's welfare. A youth officer cannot be adversarial or antagonistic toward the juvenile. [Citation.] Thus, these roles are inherently incompatible. Youth officers cannot act in their role as a concerned adult while at the same time actively compiling evidence against that juvenile." *Griffin*, 327 Ill. App. 3d at 547-48.

¶ 38    Here, Kaminski helped compile evidence against Patterson, and that work inherently conflicted with his role as a youth officer. Moreover, Kaminski did not even fulfill the most basic of a youth officer's tasks. The Juvenile Court Act provides that following an arrest of a minor, an officer must "immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where the minor is being held" (705 ILCS 405/5-405(2) (West 2008)), to permit the minor to have the help of a concerned adult, if possible, during police questioning. *People v. Westmorland*, 372 Ill. App. 3d 868 (2007). Kaminski attempted to contact two persons in their offices at SBHS at 10 p.m. on a Sunday night, and he left them messages. But two minutes after leaving the messages, police initiated questioning, and they knew or should have known that no person would hear or respond to those messages for several hours. Kaminiski did not attempt to find out who bore legal responsibility for Patterson's care or how he could contact such a person at 10 p.m. on a Sunday night. Kaminski did not attempt to contact Patterson's parents or legal guardian. Kaminski did not attempt to find the home phone number or the cell phone number for Patterson's caseworker. Kaminski's two calls to offices on a Sunday night, where he left messages, are not reasonable attempts to contact a person or concerned adult who could help Patterson. See *G.O.*, 191 Ill. 2d at 52-54.

¶ 39    Kaminski's decision not to contact Patterson's parents or the person legally responsible for Patterson's care or any other person concerned for his welfare, when they likely would not learn of the arrest and questioning without information from the police, effectively prevented any concerned adults from helping Patterson. Compare *J.J.C.*, 294 Ill. App. 3d at 236-37; see also *People v. Mitchell*, 2012 IL App (1st) 100907, ¶¶ 97-99 (Salone, J., specially concurring). Instead, Kaminski assured that only police officers trying to build a case against Patterson, persons trying to put Patterson in prison for a long time, would know about the questioning. See *People v. Fuller*, 292 Ill. App. 3d 651, 667 (1997). We find that Kaminski and other police made no "reasonable attempt" to contact any concerned adult before questioning Patterson. See 705 ILCS 405/5-405(2) (West 2008). The manifest weight of the evidence contradicts the trial court's finding on this issue. See *G.O.*, 191 Ill. 2d at 49.

¶ 40    Due to his youth and inexperience when confronting these charges that required the court to try him as an adult, Patterson needed a concerned adult to help him respond to police questioning and to ensure that he made any admissions of his own free will. A minor who understands his rights may still have his will overborne by police in custodial interrogation. See *People v. McDaniel*, 326 Ill. App. 3d 771 (2001). Weighing all the facts and considering the appropriate factors *de novo*, we find that the prosecution did not show that Patterson confessed freely and voluntarily. Therefore, we hold that the trial court erred when it denied the motion to suppress the typewritten statement.

¶ 41    The State does not argue that we could find the error harmless. Because confessions have such persuasive effect as evidence of guilt, the erroneous admission of a confession into evidence rarely constitutes harmless error. *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988). Although the prosecution presented a strong case against Patterson, we cannot say that the erroneous admission into evidence of the signed statement confessing the crime had no prejudicial effect here. Accordingly, we reverse the judgment and remand for a new trial without the confession.

¶ 42                                   Rape Shield Law

¶ 43    Illinois's rape shield law (725 ILCS 5/115-7(a) (West 2008)) bars evidence of the past sexual history of an alleged sexual assault victim, except (1) as evidence of the alleged victim's prior consent to sexual conduct with the defendant, offered to show consent, or (2) when the constitution requires the court to admit the evidence. The trial court has discretion to decide evidentiary issues, and we will reverse the trial court's decision only if it has abused its discretion. *People v. Santos*, 211 Ill. 2d 395, 401 (2004).

¶ 44    The court in *People v. Anthony Roy W.*, 324 Ill. App. 3d 181 (2001), applied the second exception to the rape shield's general principle. The prosecution in *Anthony* accused the defendant of having sexual intercourse with his 12-year-old daughter. A doctor testified that he found evidence of sexual trauma to the girl's hymen. Defense counsel failed to offer evidence that the girl had had intercourse with a boy. The appellate court found that the defendant received ineffective assistance of counsel. *Anthony*, 324 Ill. App. 3d at 186-87. The court in *Anthony* points out that, in some instances, due process requires the admission of evidence of the victim's sexual history where that evidence is relevant to a critical aspect

-9-

of the defense. *Anthony*, 324 Ill. App. 3d at 186. Therefore, the court should admit evidence of an alleged sexual assault victim's sexual history, despite the rape shield law, when "that history explains some physical evidence, such as semen, pregnancy, or physical indications of intercourse." *Anthony*, 324 Ill. App. 3d at 186.

¶ 45    At trial, Patterson sought to present evidence that E.C. had sexual intercourse with her boyfriend within a few days prior to the incident with Patterson, and the swab of E.C.'s vagina held DNA from that boyfriend. The doctor who examined E.C. testified that the redness of her cervix showed that she recently had sexual intercourse, and the prosecution used that evidence to support the inference that E.C. had intercourse with Patterson, contrary to his testimony about the incident. The excluded evidence here, like the excluded evidence in *Anthony*, "provided a plausible alternative source of the State's physical evidence and would therefore be admissible under the constitutional exception provision of the rape shield doctrine." *Anthony*, 324 Ill. App. 3d at 186.

¶ 46    The State argues that the facts in this case more closely resemble the facts of *Santos*, 211 Ill. 2d 395, and *People v. Freeman*, 404 Ill. App. 3d 978 (2010), than the facts of *Anthony*. The defendant in *Santos* sought to introduce evidence that the 16-year-old girl who accused him of raping her had made two inconsistent out-of-court statements about the incident. He argued that the evidence showed that she lied out of court, and he wanted to use the evidence to persuade the jury that she lied again in court. The *Santos* court held that the defendant had no constitutional right to introduce the evidence of impeachment on a matter collateral to the victim's testimony at trial. The court distinguished *Anthony* on grounds that the defendant in *Anthony* had a constitutional right to present evidence of prior sexual intercourse with someone other than the defendant to explain the physical evidence of the victim's cleft hymen. In *Freeman*, the State introduced evidence at trial that the victim had not had intercourse before the defendant assaulted her. The *Freeman* court found that no exception to the rape shield law permitted the introduction into evidence of this information about the victim's sexual history. Neither party argued that the defendant's constitutional rights required the court to allow the testimony about the victim's virginity into evidence. Because this case involves the defendant's right to show an alternate explanation for physical evidence the State introduced as part of its proof of sexual assault, we find this case most similar to *Anthony* and not like *Santos* and *Freeman*.

¶ 47    The State in its petition for rehearing argues that *Anthony* applies only when the complainant is a minor. That is, the State contends that the rape shield law requires the trial court to admit evidence that a minor complainant had a sexual encounter that could explain physical evidence of intercourse, but it bars the court from admitting the same evidence when an adult complains of a sexual assault. Nothing in *Anthony* or the rape shield law supports the rule the State seeks to apply. Whenever the State seeks to use physical evidence of intercourse to support the inference that the alleged victim had intercourse with the defendant, the court must permit the defendant to introduce evidence of the alleged victim's sexual history insofar as that history could provide a plausible alternative explanation for the physical evidence. *Anthony*, 324 Ill. App. 3d at 186.

¶ 48    The State also argues that the evidence of intercourse with another man lacks relevance, because of "myriad other–equally plausible–medical explanations for the existence of

-10-

cervical inflammation, including infection, allergy, disease, birth control devices, etc." If these possibilities actually show the irrelevance of intercourse to explain the redness of E.C.'s cervix, the court must exclude the doctor's testimony that the redness shows that she had intercourse not long before the examination, to support the inference that Patterson had intercourse with E.C. See *People v. Enis*, 139 Ill. 2d 264, 281 (1990).

¶ 49       Following *Anthony*, we find that the trial court abused its discretion when it excluded evidence that E.C. had intercourse with someone other than Patterson, because E.C.'s intercourse with her boyfriend could account for the redness of her cervix. Therefore, on retrial, if the State introduces any evidence of E.C.'s physical condition to show that she had intercourse within a day or two of the medical examination, the court must permit the defendant to introduce evidence that doctors found semen from E.C.'s boyfriend in her vagina at the time of the medical examination.

¶ 50       In this case, because we remand for a new trial, we vacate the sentence and express no opinion on Patterson's challenge to the length of his sentence.

¶ 51                                        CONCLUSION

¶ 52       We reject Patterson's challenge to the constitutionality of the statute that provides for the automatic transfer to the criminal court of all charges of aggravated criminal sexual assault brought against minors aged 15 or older. However, we find that the trial court erred when it admitted into evidence a statement Patterson signed at the police station, because Patterson, a minor with little exposure to the criminal justice system, had no concerned adult to assist him during questioning at the police station. On remand, if the prosecution again presents testimony that the doctor who examined E.C. found physical indications that E.C. had sexual intercourse shortly before the examination, the court must permit the defense to present evidence that semen from E.C.'s boyfriend remained in her vagina at the time of the examination.

¶ 53       Reversed and remanded.