2025 IL App (1st) 240067-U

FIRST DIVISION
December 22, 2025

No. 1-24-0067

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 05 CR 23119 |
| | ) | |
| TRACY TIMMONS, | ) | Honorable |
| | ) | Margaret Ogarek, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County denying defendant's petition for postconviction relief following a third-stage evidentiary hearing; defendant's newly discovered and material evidence would probably not change the result of a retrial; this court does not have jurisdiction over defendant's claim his sentence is void and/or violates *ex post facto* principles; and defendant's claim of ineffective assistance of appellate counsel for failing to raise the *ex post facto* issue is forfeited.

¶ 2    Following a bench trial, the circuit court of Cook County convicted defendant, Tracy Timmons, of attempt (first degree murder) based on firing a handgun at the victim. The trial court sentenced defendant to 6 years' imprisonment for attempt with an additional 20 years added because defendant personally discharged a firearm in the commission of the offense. This court affirmed defendant's conviction and sentence on direct appeal. Defendant, both *pro se* and

while represented by counsel, engaged in extensive litigation of the conviction and sentence after this court's judgment on direct appeal. The instant matter involves a successive petition for relief under the Post-Conviction Hearing Act. The successive petition, supplemented by defendant and appointed counsel, proceeded, in part, to a third stage evidentiary hearing on a claim of actual innocence after which the trial court denied the petition. Defendant appeals the denial of the claim of actual innocence and the alleged second stage dismissal of defendant's claim that his sentence is void and/or a violation of due process under *ex post facto* principles. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      In September 2005 the State charged defendant, Tracy Timmons, with attempt (first degree murder), aggravated discharge of a firearm, aggravated assault, and reckless discharge of a firearm, arising from defendant firing a handgun at the victim, Reginald Armstrong. We summarized the trial testimony in resolving defendant's direct appeal. We recount that summary and any additional trial testimony relevant to the issues on appeal only to the extent necessary to understand defendant's arguments and our decisions thereon.

¶ 5      On September 4, 2005, at approximately 8:00 p.m. the victim, Armstrong, and his wife, Hollene Brown, were at a gas station. *People v. Timmons*, No. 1-06-3442 (September 30, 2009) (unpublished order under Illinois Supreme Court Rule 23) (*Timmons I*). Armstrong testified that after he and his wife arrived at the gas station, his wife exited the vehicle and entered the gas station while Armstrong "proceeded to turn around so [he could] get *** around to the correct side [(for the gas tank)] to pump my gas." Specifically, Armstrong testified that after he turned around, "There was a white Bonneville behind me, which slowly came around, and there was a gentleman driving it" and "another gentleman on the passenger side." Armstrong identified

defendant as the driver. *Id.* at 2. Armstrong had known defendant for 20 years and previously dated defendant's sister-in-law. *Id.* Defendant made an offensive comment to Armstrong as defendant drove past Armstrong's open passenger-side window. When defendant spoke to Armstrong, Armstrong "looked directly in the defendant's face." After defendant passed Armstrong's vehicle defendant jumped out of the white Bonneville with the car still moving, got back in and stopped the car, and re-exited the vehicle holding a black handgun. *Id.* at 3. "Defendant pointed the gun at Armstrong and shot." *Id.*

¶ 6     Armstrong was 15 to 20 feet from defendant. Armstrong was able to see the gun and was "looking at the fire come out of the gun." Armstrong testified he was "dazed, like I didn't believe it was happening." The driver's side window of his vehicle shattered. Armstrong testified, "after the window shattered, I put my hand up *** over my face." Armstrong noticed that defendant's gun "jammed *** or would not fire again," so he put his head down and drove away from the scene. Armstrong testified that he "had to pass the defendant in order to get out of the gas station lot, and [defendant] proceeded to try to stick his hand inside of the vehicle." Defendant was able to reach in up to his forearm before Armstrong knocked defendant's arm away and drove off. "Armstrong returned to the station two to three minutes later to get his wife." *Id.* On cross-examination, Armstrong testified there were two people in the car.[1]

---

[1]     Defendant claims Armstrong testified the passenger "was in the vehicle during the entire incident," but his citation to the record does not support that claim. The defense asked, "[Y]ou said there were two people in the car?" and Armstrong responded, "No, it was only one person besides [defendant] in the car. I could not recognize the other individual, but I knew [defendant."] Armstrong clarified there were a total of two people, defendant and someone else. Armstrong did not testify as to whether that observation was based on he and his wife's initial arrival or when the actual shooting occurred.

¶ 7      Brown testified that prior to entering the gas station there was "a Bonneville on the front pump. We [were] on the middle pump, and it was like a white Cavalier on the end pump." Brown did not see where Armstrong pulled their vehicle when she went into the gas station. When Brown was in the gas station someone was in line in front of her. On cross-examination, Brown testified that defendant's passenger was in front of her in the store. Brown knew the person in front of her was defendant's passenger because that person got back into defendant's vehicle when Brown ran outside. Brown heard gunshots, asked the cashier to call police, and proceeded outside. Brown testified she saw their vehicle. Initially, when asked where their vehicle was, Brown testified, "On the pump. On—behind a white Bonneville. It was in front of the white Bonneville." Brown then testified that the Bonneville was behind their vehicle. Brown testified she saw defendant "standing there with a gun in his hand, a .9 millimeter. And *** he was shooting it into my husband's truck." When defendant stopped shooting, Armstrong pulled off. Brown testified that it was "[a]bout five or ten minutes" between the time Brown heard the gunshots and left the gas station to when she saw Armstrong pull off. Brown testified she knew defendant because he had dated her sister.

¶ 8      Brown testified that when she heard the gunshots, she was not afraid, and her "first mind was to go check on my husband." Brown testified, "I can handle myself. *** I deal with the public every day." Brown testified that she had been employed as an armed security guard. Brown also testified that she was not afraid for her own safety because she was standing in the door of the gas station and never left the door. Brown yelled at defendant from the door that she had his license plate. Brown had testified earlier that she yelled about the license plate to get defendant off of her husband so that her husband could get away. Brown knew defendant's gun was a .9 millimeter because that was the caliber bullet recovered from their vehicle.

¶ 9    Defendant's sister, Holden, testified that defendant was at her home on the night of the shooting from 6:00 p.m. until 9:00 p.m. Defendant's fiancé, Dotson, testified that she arrived at Holden's house at approximately 5:50 p.m. looking for defendant but did not find him. Dotson left a little before 6:00 p.m. *Id.* at 4-5.

¶ 10    Defendant testified he arrived at Holden's house around 6:00 or 6:30 p.m. and stayed until 9:00 or 10:00 p.m. Defendant testified he was driving a Ford Taurus, not a white Bonneville. Defendant denied going to the gas station or shooting at Armstrong. "Defendant said he had never driven a Bonneville on September 4. Although defendant admitted he was working on a white Bonneville around the time of the shooting, he said he did not yet have keys on September 4." *Id.* at 5-6.

¶ 11    The trial court found defendant guilty on all counts alleged against him. Before sentencing, defendant's trial counsel filed a motion to withdraw because defendant had filed a complaint against him. The trial court allowed defendant to file a *pro se* posttrial motion for a new trial based on ineffective assistance of counsel. "In his motion, defendant alleged defense counsel failed to present evidence of alibi, failed to call all of defendant's witnesses, failed to investigate or send investigators to the crime scene, failed to file a notice of alibi, failed to file a suppression motion, failed 'under applicable law, to represent me was constitutionally ineffective,' failed to investigate and present evidence, and failed to file any of the motions defendant requested." *Id.* at 6-7. The trial court denied defendant's motion.

¶ 12    The trial court merged all of the counts into the conviction for attempt (first degree murder). On November 17, 2006, the trial court sentenced defendant to a total term of 26 years' imprisonment. On November 30, 2006, defendant filed a notice of appeal. On September 30,

2009, this court issued its order on defendant's direct appeal affirming defendant's conviction and sentence.

¶ 13    The issues decided in defendant's direct appeal were a speedy trial claim, a claim the trial court "erred by failing to conduct a sufficient preliminary inquiry into [defendant's] post-trial claims of ineffective assistance of counsel" (*id*. at 22), a claim of ineffective assistance of counsel because "trial counsel's entire trial performance fell below an objective standard of reasonableness" (*id*. at 25), including counsel's failure "to file a motion to reconsider defendant's sentence" (*id*. at 32); and a challenge to the sufficiency of the evidence (*id*. at 33). As to the argument that defendant received ineffective assistance of trial counsel based on counsel's failure to file a motion to reconsider sentence, this court rejected that argument because defendant had "not raised or identified a sentencing issue on appeal." *Id.* at 33. As for the sufficiency of the evidence, this court found that:

> "Both Armstrong and Brown gave substantially similar testimony regarding the details of the shooting at trial and positively identified defendant as the shooter. As our supreme court has noted, '[t]he positive identification of an accused by a single eyewitness may be sufficient to sustain a conviction.' [Citation.]
>
> Although Holden provided defendant with an alibi on the night of the shooting, the trial court found her testimony incredible. It was the trial court's function to weigh the evidence and determine the credibility of the witnesses, and we see nothing in the record to justify setting aside the court's verdict. Based on the evidence before us, we find a rational trier of fact could have found defendant guilty of attempt murder beyond a reasonable doubt." *Id.* at 34-35.

¶ 14    In the ensuing years, defendant sought various forms of relief from his conviction and sentence on a variety of grounds. We will summarize defendant's efforts in connection with our disposition of the issue to which they most closely pertain: defendant's sentencing claims. Ultimately, the trial court dismissed defendant's postconviction petition based on actual innocence.

¶ 15    This appeal followed.

¶ 16                                ANALYSIS

¶ 17                           A. Actual Innocence

¶ 18    The first issue we will address is an appeal from the dismissal of a petition for postconviction relief claiming actual innocence following a third stage evidentiary hearing. "A postconviction proceeding under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2000)) is a collateral proceeding that allows for the review of constitutional issues that were not, and could not have been, raised on direct appeal." *People v. McMillen*, 2021 IL App (1st) 190442, ¶ 10. "It is well established that 'claims not raised in a petition cannot be argued for the first time on appeal.' " *People v. Myers*, 2023 IL App (1st) 210642, ¶ 45 (quoting *People v. Jones*, 213 Ill. 2d 498, 505-06 (2004)).

¶ 19    A claim that the defendant is actually innocent of the offense for which he was convicted is cognizable under our Act. *People v. Taliani*, 2021 IL 125891, ¶ 67 (citing *People v. Washington*, 171 Ill. 2d 475, 488-89 (1996)).

> "To establish a claim of actual innocence, the supporting evidence must be
> (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive
> character that it would probably change the result on retrial. [Citations.] Newly
> discovered evidence is evidence that was discovered after trial and that the

petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citations.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. [Citations.] The conclusive character of the new evidence is the most important element of an actual innocence claim. [Citation.]

Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citations.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. [Citation.]" *People v. Robinson*, 2020 IL 123849, ¶¶ 47-48, *People v. Coleman*, 2013 IL 113307, ¶ 97.

¶ 20 "[T]hird stage hearings can involve either credibility and factual determinations or pure questions of law, where 'no new evidence is presented.' [Citations.]" *McMillen*, 2021 IL App (1st) 190442, ¶ 12. Where, as here, "a petition is advanced to a third-stage, evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit court's decision unless it is manifestly erroneous." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). "A circuit court's ruling is manifestly erroneous if it is arbitrary, unreasonable, and not based on the evidence. [Citation.]" *People v. Brown*, 2021 IL App (1st) 180991, ¶ 70. The error

must be "clearly evident, plain, and indisputable." *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002) (citing *People v. Ruiz,* 177 Ill. 2d 368, 384-85 (1997)).

¶ 21    On March 31, 2023, the trial court conducted a third-stage evidentiary hearing on defendant's claim of actual innocence. Terry Tyra, an alleged eyewitness to the shooting, was the only witness to testify. Tyra provided testimony that another person, Pickins, committed the shooting. During the hearing, defendant introduced the second of two affidavits prepared by Tyra. The first had been prepared in 2011 and was attached to one of defendant's *pro se* postconviction pleadings, which we discuss in greater detail below. The second affidavit was prepared in 2018 and was introduced for the first time at the evidentiary hearing. On July 14, 2023, the trial court issued a written order denying defendant's postconviction petition based on actual innocence. The trial court's order recounts the testimony at the third stage postconviction hearing.

¶ 22    The trial court's order states, "Mr. Tyra is a member of a gang, the Vice Lords, but a different gang than that with which [defendant] is affiliated, the GDs. [Citation.]" "Mr. Tyra watched Mr. Pickins get out of the passenger side of the white Grand Prix. [Citation.] Mr. Pickins then opened fire on the green truck, a Ford Explorer." The court noted that neither of Tyra's affidavits "included the information [testified to at the hearing] that the driver of the white Grand Prix is 'KK.' " The trial court also summarized the contents of both Tyra's June 20, 2018 affidavit prepared with the assistance of two of defendant's attorney's representatives, and Tyra's July 1, 2011 affidavit prepared by Tyra with the assistance of a clerk in the law library in the prison where Tyra and defendant were incarcerated.

¶ 23    The trial court found that Tyra's testimony does not constitute material or conclusive evidence. The court noted that it "had an opportunity to observe the testimony and demeanor of

the witness, the manner in which he answered questions put forth by [defendant] and [the State,] to which questions he hesitated and to which questions he readily responded." The court again stated that Tyra was a member of a gang that was "a different gang than the [gang] to which [defendant] was aligned." The court recounted Tyra's testimony that Tyra and defendant, who the court noted was in a separate gang, "walked together in the prison yard and spoke to each other about the neighborhood" whereupon Tyra learned that defendant had been convicted of a crime Tyra witnessed. The court "question[ed] the factual scenario presented by [defendant] in its entirety." The court listed a number of coincidences (ten of them) that defendant "expects the court to accept;" including, conveniently, that the alleged actual shooter, Pickins, is dead.

¶ 24    The trial court also found that "Tyra's affidavits improved significantly over the years" in that in the earlier affidavit, "Tyra never mentioned the name Tracy Timmmons" but, with the assistance of defendant's representatives, Tyra's latter affidavit "repeatedly included the name of Tracy Timmons." The court found that the "failure to include the name of [defendant] in the 2011 affidavit raises a credibility question for the court." So did the "substance of the *** identification testimony of the shooter." The court found that because neither Tyra nor the court was provided with an image of Pickins, the "court is left with only Mr. Tyra's testimony for the court to consider regarding [Pickins's] identity, image and physical characteristics. [Defendant] has provided nothing to corroborate Mr. Tyra's assertion." Tyra testified that Pickins is deceased, but no evidence of that fact was presented. The court concluded that "[o]ther than Mr. Trya's testimony there is no evidence that this individual [(Pickins)] ever existed."

¶ 25    The trial court also found that even if it found Tyra's testimony credible, "it still would not probably change the outcome at a trial." The court recounted Armstong's and Brown's testimony, and contrasted their testimony with Tyra's testimony that "after he pulled in, as the

shooting was starting, he tried to back up his car. Mr. Tyra's attention was torn between the shooter shooting at the other person and the traffic as he was trying to back up to escape. Mr. Tyra's ability to identify the shooter is questionable given the short time span and his divided attention." The court also noted that defendant's alibi was rejected at the earlier trial.

¶ 26 The trial court stated that Trya's "years of silence" was also a factor the court considered in weighing his testimony. The court wrote that "[d]uring the third stage hearing, there was no explanation of why after years of staying silent, Mr. Tyra was suddenly willing to cast aside his safety concerns other than it was the 'right thing to do.' " The court questioned why, then, Tyra continued to remain silent from 2011, when he completed the first affidavit, until 2018, when representatives of defendant's attorney approached him. The court found that "[n]ew, additional details were being added to Mr. Tyra's observations at the third stage hearing," specifically Tyra's identification of the driver of the white car as someone Tyra knew as "KK." The court noted that this information was not provided to anyone until Tyra's cross-examination. The court found Tyra's explanation that no one asked him unsatisfactory and demonstrative of the fact that "Tyra's testimony will not meet the conclusive standard necessary. How is this testimony credible if he is unwilling to be truthful, transparent, complete in his statement to lawyers and the court?"

¶ 27 The trial court stated that it observed Tyra's testimony and saw that when questioned by the defense, he answered directly, when questioned by the State, his "answers faltered and changed," and when asked about his affidavit, "Tyra's testimony was evasive." The court questioned the veracity of the substance of Tyra's testimony. The court found that "members of separate gangs were able to have a meeting within the Illinois Department of Corrections in a prison yard *** defies common sense." The court continued:

"It is difficult to believe the proposition that Mr. Tyra, a member of one gang, just happened to witness the attempt murder for which [defendant,] a non-affiliated gang member was convicted, and further that [Tyra,] the exculpatory eyewitness, freely offered his assistance. This court does consider the fact that Mr. Tyra stayed silent for so many years, is a convicted felon, and had to be approached by [defendant] as relevant to his credibility. Listening, watching, observing, and weighing the testimony this court simply did not find Mr. [Tyra] credible."

¶ 28    The trial court found that Trya's testimony was not conclusive or material and would not create a probability of a different outcome at retrial.

¶ 29    Defendant argued that the trial court's order dismissing his claim of actual innocence is against the manifest weight of the evidence, and the new evidence would likely change the outcome at trial, because the trial court's recollection of the evidence at the evidentiary hearing was incorrect, the trial court made assumptions not supported by the evidence, and the newly discovered evidence weighed against the "tenuous old evidence" would likely lead to a different result.

¶ 30    Defendant attacked the evidence presented at trial as "incredible and conflicting." First, defendant complained that "[n]one of the witnesses' testimony *** established any potential motive for [defendant] to shoot at Armstrong." We disagree.

¶ 31    The offense of attempt (first degree murder) is defined as follows:

   "(a) Elements of the offense.

        A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2004).

"(a) A person who kills an individual without lawful justification commits first

degree murder if, in performing the acts which cause the death:

(1) he or she either intends to kill or do great bodily harm to that

individual or another, or knows that such acts will cause death to that individual

or another; or

(2) he or she knows that such acts create a strong probability of death or

great bodily harm to that individual or another." 720 ILCS 5/9-1(a) (West 2004).

"Motive" is not an essential element of the offense of attempt (first degree murder). *People v. Richards*, 40 Ill. App. 3d 717, 721 (1976) ("motive *** is not an essential element of the offense of murder"). Therefore, the State is not required to prove a defendant's motive. *People v. Harrod*, 140 Ill. App. 3d 96, 105 (1996) ("*People v. Enright* does not require that a jury be instructed on motive. On the contrary, the court stated that the prosecution is not required to demonstrate a defendant's motive to commit a crime, and that therefore the jury should not be informed that failure to show it tends to prove that the crime was not committed." (citing *People v. Enright*, 256 Ill. 221 (1912))). Defendant's first argument concerning the relative weight of the old and new evidence is immaterial and unpersuasive.

¶ 32    Next, defendant described Armstrong's testimony as "farcical" and Brown's testimony as "fanciful." Defendant also argued that Brown's testimony conflicted with Armstrong's testimony. Defendant argued that the evidence at trial was so weak that when placed in light of Tyra's testimony the outcome is likely to be different. We disagree with defendant.

¶ 33    "At [a third stage evidentiary] hearing, the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL

113688, ¶ 34. We will reverse the trial court's findings only if they are against the manifest weight of the evidence. *Pendleton*, 223 Ill. 2d at 473. Similarly, a trial court's credibility assessments will be reversed only when they are against the manifest weight of the evidence. *People v. McDaniel*, 326 Ill. App. 3d 771, 780 (2001) (citing *People v. Buss,* 187 Ill. 2d 144 (1999)). "A trial court's judgment is against the manifest weight of the evidence when its findings appear to be unreasonable, arbitrary, or not based on the evidence." *McDaniel*, 326 Ill. App. 3d at 780. The trial court "must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. "The reviewing court's job is to 'consider the record and determine if the trial court's ultimate determination is against the manifest weight of the evidence. *** Plainly stated, this court reviews the *totality* of the evidence underlying the trial court's judgment.' (Emphasis in original.) [Citation.]" *People v. House*, 2023 IL App (4th) 220891, ¶ 105.

¶ 34    We find that the trial court's assessment of the evidence is not unreasonable or "not based on the evidence" because the trial court identified several factors that support the credibility of Armstrong's and Brown's identifications of defendant and Armstrong's and Brown's testimony was not materially conflicting. *People v. Nichols*, 27 Ill. App. 3d 372, 386 (1975) ("Evidence is material to the guilt or innocence of a defendant when it is of probative character on that question. ([Citation.]) It is probative when to the normal mind it tends to prove or disprove a matter at issue."). Instead, we find that defendant has noted only minor discrepancies in the testimony—some of which are based on inferences from what the witnesses said that the trier of fact was not required to draw—that do not detract from the witnesses' unequivocal testimony that defendant is the person who shot at Armstrong.

¶ 35    The trial court noted that Armstong testified that he knew defendant, Armstong watched as defendant fired at him, and Armstrong testified that his attention was focused on the person he recognized as defendant trying to kill him. The court also noted that Brown watched the shooting take place while standing at the gas station, and she also knew defendant. Defendant noted three alleged inconsistencies, but the precise location of the shooter as in front of or behind Armstrong's vehicle, which is subjective from the perspective of the observer, whether the passenger got out of the car before the shooting or not, or whether Brown over-estimated the length of the encounter, are all immaterial to whether defendant was the shooter. If the testimony was conflicting—and it is not clear that it was—these discrepancies do not render Armstrong's and Brown's identification unreliable where they testified consistently about the description of the white car, the circumstances surrounding the shooting, and the identity of the shooter; and both provided testimony from which a reasonable trier of fact could conclude that they both had ample opportunity to view defendant at the time of the offense, gave a high degree of attention to the shooter, and were certain in their identifications of defendant. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22 (citing, *inter alia*, *Neil v. Biggers*, 409 U.S. 188 (1972) ("A trier of fact assesses the reliability of identification testimony in light of all the facts and circumstances")).

¶ 36    Further, the evidence was not that Armstrong "ducked down" as soon as the shooting began as defendant claimed. The evidence was that Armstrong was focused on the shooter, so much so that he saw "fire" coming from the shooter's gun, and ducked down after his window shattered. There is no evidence that the gun distracted from either witnesses' observation of defendant other than its mere presence. Defendant implies that Brown was so focused on the gun, rather than the shooter, that she was able to identify the caliber of the gun. The weakness of

defendant's argument is proven by the fact that Brown actually testified that she knew the caliber of the gun from the bullets recovered from their vehicle. Brown also offered a plausible explanation for her ability to "put her safety aside" and focus on the person threatening Armstrong in the midst of gunplay—among other things, Brown was employed as an armed security guard.

¶ 37    We also find that Armstrong's and Brown's testimony is not so improbable, unconvincing, or contrary to human experience that the trial court's finding their testimony credible and according greater weight to it than Tyra's, is against the manifest weight of the evidence. *People v. Daniels*, 2025 IL App (1st) 230823, ¶ 20 ("A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. [Citation.] A reviewing court will reverse a conviction based on eyewitness testimony where that testimony is improbable, unconvincing or contrary to human experience. [Citations.]" (Internal quotation marks omitted.)). To that end, we also find that the trial court's rejection of defendant's argument that Tyra provided credible evidence of Armstrong's and Brown's "misidentification" of defendant is not against the manifest weigh of the evidence. The trial court's conclusion that Tyra is not a credible witness is not unreasonable, arbitrary, or not based on the evidence. The trial court explained in detail its reasons for finding Tyra incredible.

¶ 38    On appeal, defendant argued that the trial court's credibility determination is based on "an incorrect recollection of the evidence and assumptions" that were directly contradicted by the manifest weight of the evidence. Defendant complained the trial court:

> "incorrectly asserted, among other things, that: (1) Timmons and Tyra were
>
> members of rival gangs; (2) Tyra's original affidavit did not mention Timmons by

name; (3) Tyra's affidavits improved over time; (4) Timmons' legal team failed to 'preserve and present' notes of a meeting with Tyra to the court; and (5) that Tyra's credibility was undermined by 'years of silence.' "

¶ 39    In support of finding that Tyra and defendant were members of different gangs, the trial court cited the following testimony:

"Q. [Defendant's attorney]: Mr. Tyra, are you in a gang?

A. [Tyra]: Yes, ma'am.

Q. Are you in a gang which [defendant] is also affiliated with?

A. No, ma'am.

Q. Did you have in 2005 a gang affiliation with [defendant]?

A. No, ma'am.

Q. Did you have any other familiar association with [defendant] in 2005?

A. No, ma'am."

Then later, Tyra testified that he did not go to police, "Because I wasn't getting in the middle of a gang war."

¶ 40    The State argued that the trial court could reasonably infer from the foregoing testimony that defendant was in a gang, but not in the same gang Tyra was affiliated with. We agree that the testimony is vague. We also note that defendant's attorney solicited the testimony and did not make clear that not only was Tyra not in a gang defendant was affiliated with—a reasonable inference from Tyra's testimony—but that defendant was not in any gang. At a third stage evidentiary hearing, the trial court sitting as trier of fact is allowed to draw reasonable inferences from the evidence. *People v. Ashe*, 2019 IL App (1st) 170565-U, ¶ 47 ("the trier of fact remains

responsible for making *** the reasonable inferences to be drawn from the evidence"). We find the inference that defendant was in a gang to be reasonable.

¶ 41 Regardless, defendant overemphasized the weight the trial court placed on defendant's alleged gang affiliation to find Tyra not credible. Although the trial court expressed skepticism that members of rival gangs would be allowed to intermingle and converse in the Department of Corrections, the gang membership was only a small factor in the extreme number of coincidences, and the unlikelihood of them occurring simultaneously, that caused the trial court to question Tyra's veracity. The trial court noted that, to believe Tyra,

"the court [would have] to accept all of the following coincidences. First, that Mr. Tyra happened to be at the gas station at the exact date, time, and location of the shooting. Second, Mr. Tyra observed Troy Pickins well enough to be able to identify him despite the fact that Mr. Tyra testified that at the time Troy Pickins was shooting at Mr. Armstrong, Mr. Tyra was trying to evade bullets, and trying to back his car (thus turning away) onto the street to get away from the shots. Despite the chaos and having his attention split between those actions, Mr. Tyra saw clearly that the shooter was Troy Pickins. Third, that years later, Mr. Tyra would find himself in the same prison location as [defendant.] Fourth, that Mr. Tyra would happen to be outside in the prison yard at the same time as [defendant.] *Fifth, that these two men who are aligned with different gangs would speak to each other, alone, in the prison yard.* Sixth, that their conversation began by catching up when according to the testimony the two men were not good friends and only saw each other in the neighborhood. Seventh, that the conversation would turn to why [defendant] was in prison, and specifically, that

- 18 -

they would discuss in detail the attempt murder so many years after the shooting. Eighth, that Mr. Tyra would be the one person in the entire prison population that would miraculously be an exculpatory eye-witness to the shooting. Ninth, that Mr. Tyra would offer his assistance on multiple occasions yet remain silent for years at a time. Tenth, that the person identified as the real shooter is now deceased. Perhaps one or two of the above-listed happenstances could be understood, but to believe all of these occurred stretches the bounds of believability." (Emphasis added.)

¶ 42     It is clear from the trial court's recitation that it was not the gang affiliation itself that most troubled the court but rather the unlikelihood that a prisoner who witnessed a crime would just happen to encounter the prisoner convicted of the crime he witnessed. That problem would exist for the court whether Tyra and defendant were in the same gang or not. Therefore, the trial court's misstatement of the evidence, if there was one, does not undermine its findings, because that fact is not a primary basis of the court's ruling.

¶ 43     We similarly find defendant's complaints about the trial court's findings regarding Tyra's affidavits unpersuasive. Defendant complained that the trial court erroneously relied on its belief that Tyra's original affidavit did not mention defendant by name. First, the trial court's written order plainly demonstrates that the court was familiar with the contents of Tyra's original affidavit. Summarizing the original affidavit, the trial court's written order states, "At no time did Tyra see Tracy Timmons at the gas station. [Citation.]" Later in the order, the court wrote that "Tyra never mentioned the name Tracy Timmons. *** The lack of the name in the 2011 affidavit cannot simply be an error or attributed to the fact that Mr. Tyra prepared the affidavit

with the help of a clerk in the law library. *** [T]he failure to include the name of [defendant] in the 2011 affidavit raises a credibility question for this court."

¶ 44    While the trial court did misstate the exact contents of Tyra's original affidavit, the trial court raised other concerns about the way the affidavit was written unrelated to the mistaken belief in the complete absence of defendant's name. The trial court was concerned about the vagueness of the statements in the affidavit that "I became aware of *another man* who was in prison for the shooting incident that I witnessed Troy Pickins commit" and "I am 100% sure that *the wrong person* has been charged with a crime he did not do." (Emphases added.) The fact that Tyra only mentioned defendant by name at the end of the affidavit, after making the vague statements noted by the trial court, supports the trial court's credibility concerns. The trial court noted that Tyra "testified that he knew the importance of including pertinent information in the affidavit" and that he "knew [defendant] from where they grew up." The trial court could reasonably question why Tyra would not write that "I became aware [that Tracy Timmons] was in prison for the shooting," or "I am 100% sure that [Tracy Timmons] has been charged with a crime he did not do." Considering the trial court's written order in its entirety it is evident this was the concern the trial court meant to express. Tyra did not state in his original affidavit unequivocally that Tracy Timmons is innocent. Rather, Tyra only said that he never saw defendant at the gas station. On the contrary, defendant does not dispute, as the trial court found, that Tyra's 2018 affidavit "repeatedly included the name of Tracy Timmons throughout the document." In 2018, Tyra not only averred that defendant was not present at the shooting, he also averred that defendant was not the driver of the white vehicle. The court also expressed concern that neither affidavit identified the driver, despite the fact Tyra testified at the hearing that the driver was a person Tyra knew as "KK."

¶ 45    It is not unreasonable for this lack of clarity and completeness to raise a credibility concern. *People v. Miller*, 254 Ill. App. 3d 997, 1016 (1993) ("the degree of vagueness or contradiction in a witness' testimony is also included in the many factors to consider [in assessing credibility.] 'The credibility of a witness and the weight and value of his testimony often involve consideration of a variety of facts and circumstances, such as the appearance of the witness, his demeanor while testifying, his frankness or candor, his feeling of hostility to either of the parties or of undue friendliness to one or the other.' "), *People v. Wallace*, 210 Ill. App. 3d 325, 341 (1991) ("An identification will not be deemed sufficient to support a conviction if it is vague or doubtful."). The trial court's findings are supported by the evidence as a whole if not the trial court's specific recitation of the evidence. *House*, 2023 IL App (4th) 220891, ¶ 105 ("this court reviews the *totality* of the evidence underlying the trial court's judgment"). Because the trial court's findings are not unreasonable and are supported by the evidence we cannot find them against the manifest weight of the evidence. Therefore, we reject defendant's argument that the trial court's conclusion that the failure to include defendant's name raises a credibility concern is against the manifest weight of the evidence.

¶ 46    Defendant also argued that the trial court erred in relying on Tyra's "years of silence" to find that Tyra was not credible. Defendant argued that Tyra explained that his silence was out of concern for his own safety. However, the trial court specifically expressed concern that after Tyra did decide to assist defendant, at defendant's request and not of his own volition, and inform authorities of what he allegedly saw, because it was "the right thing to do" because "you got the wrong guy. He didn't do it," he did nothing between providing his first affidavit in 2011 and preparing his second affidavit in 2018, again not of his own volition but only after being approached by defendant's representatives. The trial court found that:

- 21 -

"Were the court to accept Mr. Tyra's testimony, it still begs the question why not

do the right thing in the seven-year span following his first affidavit? This court

was provided with two affidavits years apart, and testimony at a third stage

hearing which failed to satisfactorily answer that query."

¶ 47    On appeal, defendant did not address Tyra's inaction in this time period except to say that

Tyra remained incarcerated but "did not hesitate to provide further assistance to [defendant]

when he received a legal visit in 2018." We find that the trial court could reasonably find that the

sequence of events calls into question the credibility of Tyra's claim that he did not talk to police

about a shooting he witnessed when it occurred because was afraid for his safety but he set aside

his fear later, because it was the "right thing to do." The trial court could find that the totality of

Tyra's actions are inconsistent with his claims. That finding is not unreasonable and it is not

arbitrary. Arbitrary, as used in the context of a judicial decision, means "founded on prejudice or

preference rather than on reason or fact." ARBITRARY, Black's Law Dictionary (12th ed.

2024). The inconsistency between what he said and what he did bears a rational relationship to

the truthfulness of Tyra's statements. Further, the trial court's credibility determination based on

Tyra's silence is based on the evidence. Nor is the opposite conclusion, that Tyra stayed silent

because he had a genuine fear after actually witnessing a shooting as part of a gang war but

agreed to provide assistance due to a genuine concern about defendant's imprisonment, clearly

evident. The trial court's finding is not against the manifest weight of the evidence.

¶ 48    Finally, we do not find that the trial court's concerns about the allegedly missing notes of

defendant's representatives' meeting with Tyra was a significant factor in the trial court's

credibility determination. As the trial court itself wrote, this was nothing more than "one

additional point that this court wishes to note." Given the trial court's own qualification on its

observation, we cannot say that this concern makes the trial court's overall credibility determination against the manifest weight of the evidence. "The trial court's finding was not against the manifest weight of the evidence as the totality of the evidence does not establish that the opposite conclusion is clearly evident." *In re Su.D.*, 2025 IL App (1st) 242366-U, ¶ 44.

¶ 49    We find that the trial court's weighing of the evidence against Tyra's testimony to conclude that Tyra's evidence would not likely change the result at trial is not against the manifest weight of the evidence. Nothing defendant pointed out undermines confidence in the outcome of the trial. The question is not whether this court agrees with the trial court; the question is whether the trial court's assessment of Tyra's credibility is unreasonable, arbitrary, or not based on the evidence. Based on the trial court's explicit and extensive recitation of its reasons for questioning Tyra's credibility, and the reasonableness of its assessment, we cannot say that the trial court's finding is against the manifest weight of the evidence. Therefore, the trial court's judgment denying defendant's claim of actual innocence is affirmed.

¶ 50                              B. Sentencing

¶ 51    Next, defendant argued that (1) the trial court erred at the second stage of this postconviction proceeding when it dismissed defendant's claim that the enhanced portion of his sentence is void because the statute had been declared unconstitutional at the time of the offense; and, alternatively, (2) if not void, application of the firearm enhancement violates defendant's right to due process under *ex post facto* principles. We first address the State's response that we lack jurisdiction over these claims and/or they are forfeited. To support our findings, a summary of defendant's pleadings after his conviction and sentencing is warranted.

¶ 52    On July 27, 2010, defendant filed an initial *pro se* petition for relief pursuant to the Post-Conviction Hearing Act on the grounds his sentence violates the proportionate penalties clause

of the Illinois constitution under the identical elements test pursuant to *People v. Hauschild*, 226 Ill. 2d 63 (2007). Defendant argued that the penalty for attempt (first degree murder) is more severe than the penalty for aggravated assault "despite the fact that the elements of each offense are identical." The trial court summarily dismissed defendant's petition because the elements of the two offenses "are not identical and [defendant's] claim has no merit." Defendant did not appeal.

¶ 53    On May 9, 2011, defendant filed, without leave of court and without seeking leave of court, a *pro se* successive petition for postconviction relief ("May 2011 successive postconviction petition"). The May 2011 successive postconviction petition alleged, as it pertains to this appeal, that defendant received ineffective assistance of counsel at trial based on trial counsel's filing a motion for a new trial that "was a stunt without any substance of an objective standard of reasonableness ***that *** [was] understandably denied without hesitation." The May 2011 successive petition primarily complained about the trial court's inquiry into defendant's posttrial *pro se* claim of ineffective assistance and added a cursory statement that "counsel failed to properly investigate State and defense witnesses prior to trial and consult with [defendant] in preparation for trial."

¶ 54    On August 29, 2011, defendant, *pro se*, filed a document titled "Petition For Supplemental To Petitioner's Now Docketed Petition For Postconviction Relief" ("August 2011 supplemental petition"). *People v. Timmons*, 2013 IL App (1st) 113184-U, ¶ 7 (*Timmons II*). "Defendant did not request leave of court to file the supplemental petition and affidavit." *Id.* The August 2011 supplemental petition sought to add a claim of actual innocence to defendant's May 2011 successive postconviction petition supported by an affidavit, signed on July 1, 2011, from Tyra ("2011 affidavit").

¶ 55    On September 30, 2011, the trial court issued a written order denying defendant's motion for leave to file the May 2011 successive postconviction petition. The trial court's order states that, "As grounds for relief, [defendant] alleges that (1) his conviction is invalid because he was never indicted for possession of a firearm; (2) the trial court erred in merging counts 2 and 3 into count 1; and (3) he was denied the effective assistance of trial counsel who didn't write a comprehensive motion for a new trial which was in turn, not given much consideration by the court." The order found that defendant had failed to demonstrate cause and prejudice from failing to raise the claims in defendant's earlier petition. The order also found that all of the claims were "premised on the trial record" and as such, could have been raised on direct appeal and would have been forfeited if raised in defendant's initial postconviction petition. Moreover, the trial court found that all of defendant's claims were "substantively without merit." Specifically, regarding the ineffective assistance of trial counsel claim, the trial court found that defendant's claim was "entirely conclusory" and insufficient to "prevail on post-conviction review." The trial court's order denying defendant's motion for leave to file the May 2011 successive postconviction petition did not address the August 2011 supplemental petition claiming actual innocence or Tyra's affidavit.

¶ 56    On October 31, 2011, defendant filed a notice of appeal from the trial court's September 30, 2011 order.

¶ 57    On March 6, 2012, defendant filed a "Petition For Relief From Void Judgment" pursuant to section 2-1401(f) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401(f) (West 2010)) ("March 2012 2-1401 petition"). In the "Statement Of Facts" section of defendant's March 2012 2-1401 petition, defendant stated that, "During the pending appeal the Court held that the [addition] of the '15, 20, Lifer [*sic*]' law was unconstitutional." Defendant stated that the court's

decisions in *People v. Sharpe*, 216 Ill. 2d 481 (Oct. 6, 2005), and *People v. Hauschild*, 226 Ill. 2d 63 (June 7, 2007), "made this law unenforceable as void." The March 2012 2-1401 petition argued that defendant's conviction for attempt (first degree murder) is void because the "penalty provision of that statute violates the proportionate penalties clause of the Illinois Constitution." Specifically, defendant argued that the add-on to his sentence for attempt (first degree murder) "violated the proportionate penalties clause as it is more severe than the penalty for an offense with [identical] elements, *e.g.* armed violence with a firearm." Defendant stated, "because the offenses are [identical] but their penalties are not, [defendant's] sentence for attempted first degree murder while armed with a firearm is void." Defendant argued that because his case was on direct review when our supreme court decided *Hauschild*, he is entitled to the relief that case announced, and the proper remedy is to remand for resentencing.

¶ 58    On July 20, 2012, the trial court issued a written order denying the March 2012 2-1401 petition, finding that defendant "failed to advance a claim or defense establishing entitlement to relief under Section 2-1401," and that the "petition is untimely and [defendant] has failed to set forth any exception to the time limitation." Defendant filed a motion to reconsider and amended motion to reconsider the denial of the March 2012 2-1401 petition which, based on defendant's subsequent notice of appeal, the trial court denied on October 5, 2012. On October 29, 2012, defendant filed a notice of appeal from the trial court's order dismissing defendant's March 2012 2-1401 petition.

¶ 59    On June 14, 2013, defendant filed a "First Amended Petition for Relief From Void Judgment" pursuant to sections 2-1401(f) and 18-107 of the Code (735 ILCS 5/18-107 (West 2012) ("Seeking wrong remedy not fatal.")) ("June 2013 amended 2-1401 petition"). Defendant's June 2013 amended 2-1401 petition asserted the following claims:

(1) Ineffective assistance of trial and appellate counsel for failing to inform defendant and to invoke defendant's right to protection from double jeopardy and placing him "at risk" of double jeopardy.

(2) Violation of defendant's right to due process by the trial court by permitting defendant to be placed at risk of being deprived of his right to double jeopardy protection by defendant's attorneys.

(3) Deprivation of defendant's fifth amendment right against double jeopardy by being placed at risk of a double jeopardy violation.

(4) Violation of defendant's right to due process by the imposition of mandatory supervised release (MSR) that was not imposed by the trial court.

¶ 60    On September 20, 2013, the trial court issued a written order dismissing defendant's June 2013 amended 2-1401 petition. On October 18, 2013, defendant filed a notice of appeal. The Office of the State Appellate Defender was appointed to represent defendant and filed a motion for leave to withdraw as appellate counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987).

¶ 61    On November 7, 2013, this court reversed the trial court's September 2011 order denying defendant leave to file the May 2011 successive postconviction petition. This court found that the record indicated that the trial court

> "did not exercise its discretion on whether to allow defendant leave to file his
> supplemental petition. Although the supplemental petition and affidavit were file-
> stamped by the clerk's office a month before the court's ruling, the document
> does not appear on the half-sheet and there is no indication in the record that the
> court was aware of the filing." *Timmons II*, 2013 IL App (1st) 113184-U, ¶ 13.

We "remand[ed] this cause with directions to rule on defendant's request for leave to amend his successive petition." *Id.* ¶ 14.

¶ 62     On April 10, 2014, in a summary order pursuant to Illinois Supreme Court Rule 23(c) (eff. Jul. 1, 2011), this court affirmed the trial court's *sua sponte* dismissal of defendant's March 2012 2-1401 petition. *People v. Timmons*, 2014 IL App (1st) 123269-U. The sole contention addressed on appeal was "that the trial court did not impose a term of mandatory supervised release (MSR) as part of [defendant's] sentence so that the imposition of an MSR term *** infringed upon the trial court's sentencing authority." *Id.* ¶ 1. This court found that our supreme court had "recently rejected such a claim" and affirmed the judgment dismissing defendant's March 2012 2-1401 petition. *Id.* ¶¶ 2-3. This court's order noted that the claim under review was not raised in defendant's May 2011 successive postconviction petition "as amended."

¶ 63     On May 20, 2014, by placement in the institutional mail at Centralia Correctional Center, defendant filed a *pro se* "Leave To File Amended Successive Post-Conviction Petition" (that was file-stamped June 3, 2014) (hereinafter "May 2014 amended successive postconviction petition"). Defendant's May 2014 amended successive postconviction petition stated claims that: (1) defendant received the 20-year enhancement to his sentence for personally discharging a firearm while committing attempt (first degree murder) in violation of his right to due process under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the indictment did not plead the sentence enhancement; (2) the trial court violated the one-act, one-crime rule when it merged defendant's convictions; and (3) the trial court erroneously imposed a more severe sentence because defendant exercised his right to a trial.

¶ 64    On April 8, 2016, defendant, acting *pro se*, filed a "Motion For Corrected Mittimus" ("April 2016 motion for corrected mittimus"). The April 2016 motion for corrected mittimus complained that the trial court's oral pronouncement of sentence established that the court sentenced defendant "to the 'minimum' sentence of 6 years plus a 20 year add-on" pursuant to the sentencing provision for attempt (first degree murder) (720 ILCS 5/8-4(c)(1)(C) (West 2006)), but the mittimus "indicates only that Defendant was sentenced to a term of 26 years rather than 6 years plus a 20 year add-on." The April 2016 motion for corrected mittimus also argued that the trial court did not have the authority to impose the 20-year add on because defendant was not charged under section 8-4(c)(1)(C), "and it was not alleged in the indictment that [defendant] 'personally discharged' a firearm."[2] Defendant argued that because the State did not charge him with the sentence enhancement portion of the attempt statute in the indictment, the enhanced portion of his sentence is void.

¶ 65    Defendant's April 2016 motion for corrected mittimus went on to argue as follows:

> "19) The reason for the State's decision not to allege in the Indictment that [defendant] 'personally discharged' a firearm, and not charge [defendant] with the enhancement provision of the Attempt statute may be because at the time that [defendant] was charged with Attempt/First Degree Murder in September 2005 the enhancement provision of the Attempt/First Degree Murder provision *** was held unconstitutional in *People v. Morgan*, 203 Ill. 2d 470, 272 Ill. Dec. 160, 786 N.E.2d 994 (2003) (declaring the sentence enhancement provision of the attempt

---

[2]    However, defendant quoted the indictment stating that "he discharged a firearm into a vehicle occupied by Reginald Armstrong."

first degree murder statute unconstitutional.) The State may have not wanted to allege unconstitutional provisions of the statute.

20) However, at the time of [defendant's] sentencing, November 17, 2006, the sentence enhancement provision of the attempt first degree murder statute was reenacted by *People v. Sharpe*, 216 Ill. 2d 481, 298 Ill. Dec. 169, 839 N.E.2d 492 (2005) (overruling *Morgan*, and reinstating the sentence enhancement provision of the attempt first degree murder statute). This may explain the sentencing judge's reasoning for referencing the sentence enhancement provision of the attempt first degree murder statute during [defendant's] sentencing.

21) Moreover, the 20 year sentence enhancement portion of [defendant's] sentence is void where the sentence enhancement for attempt first degree murder was invalid at the time which [defendant] was charged [in] September 2005 under *People v. Morgan*, *Supra*.

22) Although *People v. Sharpe*, *Supra*., overruled *Morgan* and reinstated the sentence enhancement provision of the attempt first degree murder statute, the sentence enhancement was erroneously applied to [defendant's] sentence in violation of *ex post facto* principles where the decision in *Sharpe* did not announce a 'new rule' and, therefore, should not have been applied retroactively."

¶ 66    Defendant concluded, however, that "[b]ecause the prosecution failed to charge [defendant] with the enhancement portion of the statute and neglected to allege in the charging instrument that [defendant] 'personally discharged' a firearm, the 20 year sentence enhancement portion of [defendant's] sentence is void." Defendant stated that when the mittimus is corrected, he "may seek the appropriate remedy of challenging the void portion of his sentence."

¶ 67    On September 30, 2016, this court allowed defendant's appointed appellate counsel leave to withdraw and affirmed the trial court's judgment dismissing defendant's June 2013 amended 2-1401 petition.

¶ 68    On October 28, 2016, defendant, through appointed counsel, filed a "Motion For Leave To File Amended Supplemental Petition For Post-Conviction Relief And Actual Innocence Claim" ("October 2016 amended supplemental postconviction petition"). The October 2016 amended supplemental postconviction petition specifically stated that "[t]his Amended Supplemental Petition for Post-Conviction Relief augments but does not replace the previously filed *Pro-se* successive Post-Conviction Petition filed on May 9, 2011, the *pro-se* Petition for Supplemental to Petitioner's Now Docketed Petition for Postconviction Relief filed on August 11, 2011 and the *Pro-se* Leave to File Amended Successive Post-Conviction Petition filed on May 20, 2014." The October 2016 amended supplemental postconviction petition argued that defendant's August 2011 supplemental petition satisfies the cause and prejudice test and should be considered, defendant received ineffective assistance of trial counsel based on trial counsel's failure to present Tyra's testimony, and defendant "was denied his due process right to a fair trial by the cumulative impact of errors in all issues raised in [defendant's] Supplemental and Amended Supplemental Petitions." The October 2016 amended supplemental postconviction petition did not mention the April 2016 motion for corrected mittimus.

¶ 69    On April 7, 2017, the State filed a "Motion To Dismiss Petitioner's Post Conviction Petition" (State's motion to dismiss). The State's motion to dismiss referenced defendant's July 2010 initial *pro se* postconviction petition, May 2011 *pro se* successive postconviction petition, August 2011 supplemental successive postconviction petition, defendant's March 2012 2-1401 petition, and, finally, defendant's motion for leave to file amended petition for postconviction

relief and actual innocence claim filed by appointed counsel. As it pertains to this appeal, the State's motion to dismiss argued that defendant's "sentencing issues" were barred by *res judicata* and/or forfeiture because they were or could have been raised on direct appeal and in defendant's initial *pro se* postconviction petition.

¶ 70    On October 27, 2017, the trial court held a hearing on the State's motion to dismiss. Defendant's attorney argued, in part, that one of the arguments that defendant was advancing "involves a supplemental pleading by my client on April 8, 2016 where he filed his motion *** to correct the mittimus." Defendant's attorney asked the court to "take notice of [defendant's] *pro se* pleading *** so that that matter is addressed by the Court." The "basic argument [was] that the statute did not allow for [defendant] to be sentenced to a 26 year term and he should have received a six year term." Following the hearing, on January 19, 2018, the trial court issued an oral ruling on the motion. The court referenced defendant's August 2011 supplemental petition claiming actual innocence based on Tyra's affidavit. The court stated that it docketed the "successive petition based upon the actual innocence claim *** and then we had a second stage hearing." The court stated that "with regards to the other issues, I stand on the ruling I made on the initial successive petition." The court found that "there has been enough evidence produced by the affidavit of Terry Tyra that would warrant a third-stage hearing on the claim of actual innocence ***. So the matter will be moved to a third-stage hearing on that claim and solely on that claim." The parties did not address defendant's motion to correct the mittimus either at the hearing, nor at the trial court's oral ruling on the State's motion to dismiss.

¶ 71    On January 17, 2020, defendant, through counsel, filed a "Motion To Vacate 20 Year Firearm Enhancement Portion of Defendant's Sentence" (January 2020 motion to vacate sentence enhancement). The motion sought relief pursuant to section 2-1401(f) of the Code. The

January 2020 motion to vacate sentence enhancement argued that when defendant committed the

offense, the decision in *Morgan* was in effect holding the sentence enhancement

unconstitutional, but before defendant was sentenced our supreme court decided *Sharpe*,

overruling *Morgan* and reinstating the firearm enhancement. The motion argued that defendant

had a right to elect to be sentenced under either the law in effect when the crime was committed

(which the motion contends was *Morgan*), or the law in effect when he was sentenced (*Sharpe*).

The motion argued that defendant "was never admonished \*\*\* as to which law he elected to be

sentenced under and the court simply sentence[d] him to a 20 year firearm enhancement as

enunciated in the *Sharpe* decision." The motion argued that the enhanced portion of defendant's

sentence is void because the "court exceeded the sentencing limit enunciated in *Morgan*." The

motion argued that "we are dealing with a judicial decision rather than a statute but the law

regarding void judgments is still the same."

¶ 72     On February 21, 2020, the State filed a motion to dismiss defendant's January 2020

motion to vacate sentence enhancement (titled State's "Motion To Dismiss Petitioner's Section

2-1401 Petition"). The State's motion to dismiss argued that since our supreme court abolished

the "void sentence rule" in *People v. Castleberry*, 2015 IL 116916, ¶ 19, defendant cannot rely

on section 2-1401(f) for relief from his sentence and must file a successive postconviction

petition; and, consequently, defendant's motion pursuant to section 2-1401 is untimely.

Alternatively, the State's motion to dismiss defendant's January 2020 motion to vacate sentence

enhancement argued that defendant's sentence is valid because *Sharpe* reinstated the sentence

enhancement, and in *People v. Hauschild*, 226 Ill. 2d 63 (2007), our supreme court held that

*Sharpe* applies retroactively. Finally, the State's motion argued, as the trial court "noted in its

ruling on October 5, 2012 on [defendant's] previously filed section 2-1401, [defendant] suffers

no prejudice as 26 years is within the sentencing range of [defendant's] attempt first degree murder conviction."

¶ 73 On December 1, 2021, defendant filed a *pro se* "Complaint For Order of *Habeas Corpus*." Defendant's December 2021 complaint for *habeas corpus* argued, in pertinent part, that defendant was illegally imprisoned because the "trial court violated *ex post facto* laws when it imposed the 20 year firearm enhancement as said enhancement was deemed unconstitutional at the time of the commission of the offense." Defendant argued that the commission of the offense was "outside the scope of the firearm enhancement law reenacted in October of the same year" by *Sharpe*. Defendant also argued that the State never "charged" the enhancement, therefore, the trial court lacked jurisdiction to impose it, and the court denied defendant due process because it imposed an enhancement that was not alleged in the charging instrument nor proven beyond a reasonable doubt.

¶ 74 On December 17, 2021, the trial court held a hearing on the State's motion to dismiss defendant's January 2020 motion to vacate sentence enhancement (which motion referenced section 2-1401(f) as authority to file the motion). At the hearing, the State argued that procedurally, defendant's claim was not cognizable in a 2-1401 motion because *Castleberry* abolished the void sentence rule and the motion was filed more than two years after the judgment. The State argued that defendant would have to raise his claim that his sentence is invalid under *Morgan* in a successive postconviction petition. The trial court asked defendant's private counsel, "are you asking this Court to consider that motion that you have filed as it relates to this sentence *** as a supplemental postconviction petition?" Defendant's attorney responded, "Yes." Defendant's attorney argued that he "never designated my motion as a 2-1401 motion anywhere," and claimed they were seeking leave to file a supplemental postconviction

petition as it relates to that sentencing issue. The State argued that the motion failed to cite any provision of the Act nor seek leave to file a successive petition, therefore, the motion had to be treated as a motion pursuant to section 2-1401. At oral argument, the trial court stated, "I am inclined at this point to grant the State's motion to dismiss on the 2-1401, and certainly the defendant is entitled to file a successive postconviction petition." The court stated it wanted to review the case law, then stated, "So let's get a short date for me to make my ruling on this case, on this 2-1401 motion that I have before me." The court continued the matter for its ruling.

¶ 75 On March 4, 2022, the trial court issued its written order on the State's motion to dismiss defendant's January 2020 motion to vacate sentence enhancement. The order found, in pertinent part, that, "[b]ecause the document does not cite to the Post Conviction Act, yet does cite to 2-1401, the court considers [defendant's] Motion pursuant to 735 ILCS 5/2-1401." The court further found:

> "In the matter at hand, [defendant] argues that the sentence is void or voidable due to a sentencing issue—namely, that [defendant] was not afforded an opportunity to choose which sentencing scheme to apply. This is not an issue where the trial court lacked jurisdiction (either personal or subject matter), nor is this an issue that the statute at play was facially unconstitutional and void *ab initio*. Rather, this is an issue or challenge to the sentence, which falls squarely within the realm of *Castleberry*."

¶ 76 The trial court found that, pursuant to *Castleberry*, the motion is subject to the time limitations on motions brought pursuant to section 2-1401, the motion is untimely, and, therefore, the motion is subject to forfeiture. The court also "decline[d] to recharacterize

[defendant's] Motion into a post-conviction petition." The court dismissed defendant's motion specifically on untimeliness grounds.

¶ 77     Turning to this appeal, first, the State argued that defendant raised his "sentencing claims" in a separate 2-1401 motion that was not made part of defendant's successive or supplemental successive postconviction petition, and defendant did not appeal the trial court's dismissal of that separate 2-1401 motion. Defendant argued he raised "this claim" several times, including in his May 2014 *pro se* Motion For Leave To File Amended Successive Post-Conviction Petition and April 2016 *pro se* Motion For Corrected Mittimus, and his October 2016 Motion For Leave To file Amended Supplemental Petition For Post-Conviction Relief And Actual Innocence Claim. As for defendant's 2-1401 motion, defendant argued that following the hearing where defendant *requested* that the January 2020 2-1401 motion be treated as a motion for leave to file a supplemental postconviction petition, "the circuit court entered an order dismissing [defendant's] claims."

¶ 78     The State argued that defendant's *pro se* Motion for Corrected Mittimus filed on April 8, 2016, "did not raise the particular claim before [us] regarding [defendant's] sentence being void *ab initio*." The State argued that neither the successive nor the supplemental postconviction petition, nor the incorporated motions, contained this void *ab initio* claim. The State conceded that defendant asked the trial court to "take notice of defendant's *pro se* Motion for Corrected Mitt" but noted that that pleading raised a deficiency in the charging instrument. Furthermore, as we noted above, defendant's attorney did not argue the merits of the motion and the trial court did not rule on it.

¶ 79     In reply, defendant did not direct this court to a postconviction pleading wherein defendant argued the sentence enhancement was void *ab initio* under *Morgan* when the offense

was committed and the reinstatement of that sentence enhancement by *Sharpe* is not applicable to him. Instead, defendant admitted that his "*pro se* petition referred to the State's failure to include the potential enhancement in his original indictment" and his April 2016 *pro se* Motion For Corrected Mittimus asserted that "the State failed to provide sufficient notice of the enhancement and to prove that he was eligible for an enhanced sentence beyond a reasonable doubt." Defendant admitted that *Morgan* merely "supplied part of the factual and legal background for his claim" that the State failed to provide sufficient notice of the enhancement.

¶ 80      Further, defendant admitted that the October 2016 "Motion For Leave To File Amended Supplemental Petition For Post-Conviction Relief And Actual Innocence Claim" did not expressly incorporate the April 2016 Motion For Corrected Mittimus but instead only stated that it "augments but does not replace the previously filed Pro-se successive Post-Conviction Petition filed on May 9, 2011, the *pro-se* Petition For Supplemental To Petitioner's Now Docketed Petition for Postconviction Relief Filed on August 11, 2011 and the *Pro-se* Leave to File Amended Successive Post-conviction Petition filed on May 20, 2014."

¶ 81      The record demonstrates that defendant did not raise the claim argued in this appeal in defendant's petition for postconviction relief as supplemented. The closest defendant came to raising this claim was in the motion for corrected mittimus. However, that motion was neither pled nor adopted as a supplemental or successive postconviction petition. Defendant's request that the trial court "take notice" of the motion is insufficient. *People v. Wideman*, 2013 IL App (1st) 102273, ¶ 16 ("A violation of the *** pleading requirements can be fatal to a defendant's postconviction petition."), *People v. Swamynathan*, 236 Ill. 2d 103, 112 (2010) ("A trial court is not required to recharacterize a *pro se* pleading as a postconviction petition, even if the claims

raised are cognizable under the Act."). Defendant cannot raise the claim now on appeal. *Myers*, 2023 IL App (1st) 210642, ¶ 45.

¶ 82    Defendant is correct that an "order partially dismissing [a] petition [on one issue] and advancing it for a third stage hearing only on [a different] issue [is] both a step in the procedural progression of [the] case and a preliminary determination necessary to reach the final judgment" and, therefore, can be considered on appeal from the final judgment dismissing a postconviction petition after a third stage hearing. *People v. Garcia*, 2015 IL App (1st) 131180, ¶¶ 68-69. However, in this case, the sentencing claim at issue was not addressed or dismissed in defendant's petitions under the Act. Rather, defendant raised this issue, if defendant raised this specific issue at all, in separate proceedings under section 2-1401.

¶ 83    Defendant's notice of appeal listed the July 14, 2023 judgment denying defendant's successive petition for postconviction relief. " 'A notice of appeal confers jurisdiction on the reviewing court to consider only the judgments or pertinent parts specified in the notice.' *People v. Patrick*, 2011 IL 111666, ¶ 21." *People v. Niffen*, 2018 IL App (4th) 150881, ¶ 29. Therefore, we must agree with the State that because the void sentence issue is "extraneous to the *** dismissal order, which defendant specified in his notice of appeal, we lack *** jurisdiction to consider those issues." *Id.* We find that this court lacks jurisdiction to consider defendant's argument the enhanced portion of his sentence is void.

¶ 84    Finally, we turn to defendant's argument that retroactive application of *Sharpe* to defendant violates his right to due process. Defendant stated the he argued that the trial court violated *ex post facto* laws in his 2021 Complaint For Order Of *Habeus Corpus*. Again, we must first address the State's argument that this claim is forfeited. Defendant admitted that this issue could have been raised on direct appeal but argued that the issue is not forfeited because he

"repeatedly raised this issue" following this court's remand from the dismissal of his postconviction petition, and his amended supplemental petition raised a claim of ineffective assistance of counsel on direct appeal for "failing to include potentially valid claims in his prior proceedings." The State responded that none of defendant's pleadings "reflect this *ex post facto-* based claim." The State argued that defendant's December 2021 pleading was not explicitly incorporated into defendant's postconviction petition and defendant did not file a notice of appeal with regard to that pleading. Therefore, the State argued, this court has no jurisdiction over that matter. Alternatively, the State argued that the issue is waived because defendant could have raised the issue on direct appeal. Regarding defendant's prior claims of ineffective assistance of counsel, the State argued that they were "not in the context of *** having failed to raise this sentencing issue," therefore, forfeiture applies.

¶ 85    In reply, defendant argued that he argued that his sentence violates due process and that he was not notified of the 20-year enhancement. The pleading to which defendant referred, the May 2014 *pro se* motion for "Leave to File Amended Successive Post-Conviction Petition" argued, in pertinent part, that the fact that the enhanced sentence was not pled in the charging instrument and proven beyond a reasonable doubt "is a violation of [defendant's] due process ***, therefore his enhanced 20 year sentence *** is void." Defendant's argument relied on *Apprendi* for its support.  Defendant also argued that "he unambiguously argued in 2016 ***that his sentence violated '*expost facto* [*sic*] principles.' " The pleading defendant cited is the April 2016 Motion For Corrected Mittimus which, we have already found, was not part of defendant's postconviction proceedings under the Act.

¶ 86    The State cited *Jones*, 213 Ill. 2d at 505, where this court recognized that "a claim not raised in a petition cannot be argued for the first time on appeal." The *Jones* court also instructed

that the court "has only provided for successive petitions as the sole exception to the waiver language" of the Act, and that the cause and prejudice test is to be used "as the analytical tool for determining whether fundamental fairness allows for the relaxation of the waiver rule." *Jones*, 213 Ill. 2d at 505-06. The State also cited this court's decision in *People v. Hatchett*, 2015 IL App (1st) 130127. In *Hatchett*, the defendant's postconviction petition alleged ineffective assistance of counsel based on a conflict of interest. *Hatchett*, 2015 IL App (1st) 130127, ¶ 28. On appeal, the defendant argued that "there was no evidence that he ever consented to the continued representation *** either before or after the disclosure of the conflict." *Id.* ¶ 31. This court held that "[t]o the extent that the defendant now complains he was denied his right to counsel of *choice,* we find this argument to be forfeited for review on appeal where it was not raised in his postconviction petition." *Hatchett*, 2015 IL App (1st) 130127, ¶ 31 (citing *People v. Jones*, 211 Ill. 2d 140, 148 (2004)).

¶ 87    We agree with the State that defendant's postconviction petition, as supplemented, did not raise the *ex post facto* claim defendant asserts in this appeal. We find this court lacks jurisdiction over defendant's claim his sentence is a violation of due process under *ex post facto* principles. Because we lack jurisdiction, we decline to comment on whether defendant may file a successive postconviction petition raising that claim. "Where this court lacks jurisdiction, we must dismiss the appeal; as noted in other contexts, our courts do not sit to render advisory opinions on abstract questions of law to guide potential future litigation." *Steel City Bank v. Village of Orland Hills*, 224 Ill. App. 3d 412, 416 (1991). Furthermore, defendant did not point to any portion of his postconviction petition claiming ineffective assistance of appellate counsel for filing to raise an *ex post facto* violation. To the extent defendant attempted to raise that claim

now, "we find this argument to be forfeited for review on appeal where it was not raised in [defendant's] postconviction petition." *Hatchett*, 2015 IL App (1st) 130127, ¶ 31.

¶ 88                                    CONCLUSION

¶ 89    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 90    Affirmed.